IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.

DAVID WAYNE HOLLEMAN,

Defendant.

No. CR12-0040

REPORT AND
RECOMMENDATION

_____

**TABLE OF CONTENTS**

I.     *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    *PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.   *RELEVANT FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     A.    *Stop in Western Iowa* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     B.    *Encounter in Eastern Iowa* . . . . . . . . . . . . . . . . . . . . . . . . 7
          1.    *Locating and Surveilling Defendant's Vehicle* . . . . . . . . . . . 7
          2.    *Free Air Dog Sniff of the Vehicle* . . . . . . . . . . . . . . . . . . 7
          3.    *Obtaining a Search Warrant* . . . . . . . . . . . . . . . . . . . . 9
          4.    *The Search* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IV.   *DISCUSSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
     A.    *Was the Vehicle Stop in Western Iowa Unlawful?* . . . . . . . . . . . 11
          1.    *Speeding* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
          2.    *Following Too Close* . . . . . . . . . . . . . . . . . . . . . . . . . 13
     B.    *Was the Stop Unduly Prolonged?* . . . . . . . . . . . . . . . . . . . . . 15
     C.    *Was the Search in Eastern Iowa Unlawful?* . . . . . . . . . . . . . . . 20
          1.    *The Automobile Exception* . . . . . . . . . . . . . . . . . . . . . 21
          2.    *Properly Trained and Reliable Drug Dog* . . . . . . . . . . . . . 25
          3.    *Trespass* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
     D.    *Does a Franks Violation Preclude Reliance on the Automobile Exception?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

|  | 1. | Alleged Franks Violation | 30 |
|  | 2. | Requested Sanction | 35 |
| E. | | Was Defendant Unlawfully Detained and Questioned? | 38 |
|  | 1. | Seizure | 39 |
|  | 2. | Questioning | 41 |
|  | 3. | Search of the Hotel Room | 42 |
| V. | SUMMARY | | 42 |
| VI. | RECOMMENDATION | | 43 |

## I. INTRODUCTION

On the 13th day of July 2012, this matter came on for hearing on the Motion to Suppress (docket number 21) filed by the Defendant on June 29, 2012. The hearing continued on August 6 and was concluded on August 16. The Government was represented by Assistant United States Attorney Dan Chatham. Defendant David Holleman appeared personally and was represented by his attorney, Dean A. Stowers.

## II. PROCEDURAL HISTORY

On May 9, 2012, Defendant David Wayne Holleman was charged in a criminal complaint with possession of marijuana with intent to distribute.[1] A grand jury returned an indictment on May 22, charging Defendant with the same offense. At his arraignment, Defendant entered a plea of not guilty and trial was scheduled before Chief Judge Linda R. Reade on July 23, 2012.

On June 29, Defendant timely filed the instant motion to suppress. Because of the pending motion, the trial was continued to August 27 and, more recently, to October 8, 2012.

---

[1] *See United States v. David Wayne Holleman*, No. 1:12-MJ-00090-JSS (N.D. Iowa).

## III. RELEVANT FACTS

### A. Stop in Western Iowa

In the afternoon of May 8, 2012, Trooper Jerod Clyde of the Iowa State Patrol was heading home with his dog after receiving K-9 training in Des Moines. Clyde has been a trooper for 15 years and is assigned to the Criminal Interdiction Unit at Post 15. Clyde has received special training in identifying drug-related activity, and testified that on routine traffic stops he "tries to make it into something bigger."

After leaving Des Moines, Trooper Clyde was traveling west on Interstate 80, heading toward Avoca, Iowa. As Clyde proceeded west near mile marker 44, his attention was drawn to a heavy-duty pickup truck traveling east. According to Clyde, he first noticed the truck because a local sheriff had talked to him about the theft of construction items in the area, and the truck had equipment in the back. In addition, Clyde was scheduled to attend training regarding commercial vehicles, and he was interested in looking at the heavy duty pickup truck. Using his radar, Clyde determined the truck was traveling 73 miles per hour in a 70 mile-per-hour zone.

Trooper Clyde was unable to immediately turn around because of a deep median in that area. The evidence suggests Clyde turned around just west of mile marker 43 and caught up with the vehicle heading eastbound just east of mile marker 48.[2] Using his radar, Clyde determined that a semi truck in front of the vehicle was traveling 70 miles per hour and the pickup truck appeared to be "closing" on the semi. In addition, Clyde believed the pickup truck was following the semi too closely. After Clyde activated his top lights, the pickup truck promptly pulled over.

At approximately 4:13 p.m., Trooper Clyde exited his vehicle and approached the pickup truck on the passenger side. Defendant David Holleman was the driver and sole

---

[2] The location where Trooper Clyde turned around can be ascertained using GPS coordinates from his vehicle. *See* Defendant's Exhibits BB-1, U-1, and CC. The location where he caught up with Defendant can be seen on the video taken from Clyde's vehicle. *See* Government's Exhibit 1.

occupant of the pickup truck.  According to Clyde, Defendant rolled the passenger side window down less than one inch.  Clyde asked him to roll it down further, but Defendant said no.[3]  Clyde asked for Defendant's driver's license, insurance, and registration, which Defendant provided by handing it through "the crack."  Clyde then asked Defendant to accompany him back to the squad car.  As he was walking back to the squad car, Clyde looked under the pickup truck to determine if it had a "false bed," and it did not.

Trooper Clyde testified that upon entering the squad car, he noticed a couple of "things of interest."  When asked where he was headed, Defendant paused and then answered: "Let's see where was I going to go first . . . Cedar Rapids and then I'm going to, straight to Washington, D.C."[4]  Clyde examined the driver's license to make sure it "looked legitimate" and asked Defendant to remove his sunglasses, so he could compare the photograph.  Clyde noted that Defendant repeatedly took his sunglasses off and put them back on and, according to Clyde, showed a lot of "nervous energy."  According to Clyde, Defendant also displayed "heavy breathing."  Clyde then began the process of scanning the documents into the computer system found in the squad car.

Defendant was told that he was stopped for driving 73 miles per hour in a 70 mile-per-hour zone and for following too close.  Trooper Clyde told Defendant it was "not a big deal" and "I'm not going to write you a ticket or anything."  Clyde advised Defendant he needed to leave three "white dashes" – referring to the lane markers – between him and the vehicle in front.  In response to a question, Defendant told Clyde that he had his cruise control set at "about 68."  When asked about the two large welder/generators in the back of the truck, Defendant told Clyde that "one of them is mine and one of them is going back

---

[3] Because he was training that day, Clyde was wearing his khaki utility uniform, rather than his standard trooper uniform.  As a consequence, Clyde was not wearing a "body mic," and there is no audio of the conversation at the truck.

[4] The conversation in the squad car is recorded on Government's Exhibit 1, and Defendant helpfully provided the Court with a transcript of the conversation.  *See* Defendant's Exhibit O.

to somebody." Clyde believed it was suspicious that Defendant was hauling two welders across the country, but one was his and one was being returned. During this time, Clyde was also inputting information onto the warning memorandum.

Approximately five minutes after Defendant entered the squad car, Clyde called dispatch to request a "Triple-I" (which is a check on criminal history and warrants). In response to a question regarding his employment, Defendant said he was involved in video production. Clyde thought it odd that someone involved in video production would be hauling two large welders. The dispatcher responded approximately one and one-half minutes later, stating there was "no Triple-I" and Defendant's driver's license was valid.

After again assuring Defendant that he was not going to write any ticket, Trooper Clyde warned Defendant that the DOT may require him to have a permit to haul equipment commercially. At about that time, approximately seven minutes into the stop, Clyde called the El Paso Intelligence Center ("EPIC") on his cell phone. According to information provided by the Drug Enforcement Administration in support of its motion to quash, EPIC was established in 1974 "to collect and disseminate information relating to drug, alien, and weapon smuggling in support of field enforcement entities throughout the region." There are 18 agencies currently represented at EPIC, including the Drug Enforcement Administration, Department of Homeland Security, Federal Bureau of Investigation, and the Internal Revenue Service. Initially, EPIC focused on drug trafficking and alien smuggling on the United States-Mexico border, but it has developed into a "fully coordinated, tactical intelligence center supported by databases and resources from member agencies." Following the terrorist attacks in 2001, EPIC "add[ed] counterterrorism to its efforts." At the instant hearing, Clyde testified that EPIC has access to a number of databases, including sites across the country which record license plates, information regarding border crossings, and citizenship information.

After verifying his authority to access information, Trooper Clyde provided EPIC with Defendant's name, birth date, and driver's license number. Clyde also provided

information regarding the vehicle, including its make, model, license plate number, and the vehicle identification number ("VIN"). Approximately four and one-half minutes later, Clyde was advised that EPIC had no information regarding Defendant or the vehicle.

Less than one minute later, Trooper Clyde returned Defendant's documentation to him. At Clyde's request, Defendant then signed the warning memorandum on the computer screen. The traffic warning memorandum (Defendant's Exhibit N) was printed out and provided to Defendant. While the memorandum was printing, Clyde asked Defendant if he traveled with any firearms or controlled substances, which Defendant denied. Clyde also sought permission to search the vehicle, which Defendant refused. When Clyde asked if Defendant had "any problem if I ran a K-9 around the outside of the vehicle," Defendant initially agreed, but then refused permission. Clyde advised Defendant that he was "going to go ahead and deploy a dog" and instructed Defendant to remain in the squad car. Clyde exited the vehicle approximately 16 minutes after he and Defendant first entered the vehicle.

As Defendant waited in the squad car, Trooper Clyde got his dog out and approached Defendant's vehicle. Clyde testified, however, that it immediately became apparent that the dog was not interested in sniffing the pickup truck. According to Clyde, the dog was distracted by the carcass of a dead animal in the ditch. Accordingly, after circling the pickup truck twice, Clyde and the dog returned to the squad car. The dog sniff extended the stop by less than three minutes. Defendant was told that he was free to go and he got out of the squad car at 4:35 p.m., approximately 22 minutes after Clyde activated his red lights and pulled Defendant over.

Based on the "totality of the circumstances," Trooper Clyde suspected Defendant may be engaged in criminal activity. At the hearing, Clyde cited Defendant's nervousness, heavy breathing, stated occupation which is inconsistent with the items being hauled, claimed ownership in one of the pieces of equipment, opening the window only one inch, general demeanor, fiddling with his sunglasses, and his stated destination as reasons

leading Clyde to believe that "something is just not right." Believing that Defendant may be engaged in criminal activity, Clyde made a series of phone calls, eventually talking to Nick Nolte, an officer with the DEA Drug Task Force in Cedar Rapids.

## B. Encounter in Eastern Iowa

### 1. Locating and Surveilling Defendant's Vehicle

Cedar Rapids Police Officer Nick Nolte, who is currently assigned to the DEA Drug Task Force, testified at the hearing that he received a phone call regarding Defendant from Trooper Clyde. Clyde described the stop in western Iowa and told Nolte that his dog "wouldn't sniff" because of a nearby dead animal. Clyde was suspicious of criminal activity based on all of the circumstances surrounding the stop, but he told Nolte that Defendant had no prior criminal history. Nolte was given a description of the vehicle and its contents.

Task Force Officer Nolte decided to go out to the Interstate and watch for Defendant's vehicle. At approximately 6:45 p.m., Nolte arrived at a rest area for eastbound traffic on I-80 near Grinnell, Iowa. Nolte observed Defendant drive by at approximately 7:00 p.m. Nolte followed Defendant until he exited the Interstate at Williamsburg and checked into a hotel at approximately 7:40 p.m. DEA Special Agent Scott Smith followed Defendant into the hotel and observed him checking in. The law enforcement officers then set up surveillance on Defendant's vehicle in the parking lot. Nolte contacted the local sheriff's office to see if there was a K-9 unit available. After approximately 15 minutes, Defendant exited the hotel and drove to a nearby restaurant. He returned to the hotel approximately one hour later, parked the vehicle, and went inside.

### 2. Free Air Dog Sniff of the Vehicle

At that point, Officer Nolte called the local sheriff's office and requested a deputy with a drug dog to conduct a free air sniff of the vehicle. At approximately 9:00 p.m., Deputy Mark Tiedt of the Iowa County Sheriff's Office arrived with his dog, Henri. Tiedt had been working with Henri, who is trained to detect the odor of narcotics, since October

2009. Henri was certified as a drug detection dog at that time, and has been recertified annually since then.

Officer Nolte described Defendant's vehicle to Deputy Tiedt and told him about the stop in western Iowa. Apparently in an effort to not draw undue attention to the activity, Tiedt and Henri proceeded to the hotel parking lot alone. Tiedt started by having Henri sniff four other vehicles. According to Tiedt, Henri did not show any change in behavior. When sniffing Defendant's vehicle, however, Henri "alerted" to the area between the bed of the truck and the cab of the truck on the passenger side. After having Henri sniff an unrelated vehicle, Tiedt returned to Defendant's vehicle and Henri alerted again at the same location.

It is necessary to pause and describe the terminology used by Deputy Tiedt and other dog handlers when describing dog behavior. Henri is trained to be a "passive indicator." A passive indication means that if the dog detects the odor of narcotics, then he is trained to sit or lay down. On occasion, however, a dog may show a change in behavior without sitting, which is referred to as an "alert." According to Tiedt, "an alert is as important as an indication to me." In training an alert is scored as "unsuccessful" – because the dog does not sit or lay down as instructed – but Tiedt asserts that the change of behavior represented by an alert nonetheless demonstrates that the dog detected the odor of narcotics.

While working Henri at Defendant's vehicle, Deputy Tiedt started at the front of the vehicle and proceeded in a counterclockwise direction, walking backwards and watching the dog. Tiedt testified that when they got to the passenger side of the vehicle, "as I'm still walking, the dog stops dead in his tracks and begins to really detail the area between the bed of the truck and the cab of the truck." Asked what he meant by "detail," Tiedt explained that Henri closed his mouth and exhibited "really intense sniffing to where you can actually hear him sniffing the vehicle and just going up and down the seam trying to figure out where the odor was coming from." After approximately five seconds of this

activity, Tiedt "pulled him off." After finishing the sniff on Defendant's vehicle, Tiedt then deployed Henri on the vehicle next to it. Henri showed no change of behavior. Upon returning to Defendant's vehicle, Tiedt repeated the process and Henri again alerted at the same location. Tiedt admits that Henri did not "indicate" on either occasion.

### 3. Obtaining a Search Warrant

Following completion of the dog sniff, Task Force Officer Nolte and Special Agent Smith went to Defendant's room to speak with him. Defendant refused to allow the officers to enter the room, but agreed to accompany them out to the parking lot. Deputy Tiedt advised Defendant of the results of the dog sniff, and Nolte asked for permission to search the vehicle. After Defendant refused to consent to a search, Nolte advised Defendant that they would be seeking a search warrant. Nolte and Tiedt then left the area to seek a warrant. Smith remained with Defendant, together with two other task force officers and a local police officer who had arrived at the scene.

Officer Nolte and Deputy Tiedt proceeded to the Williamsburg Police Department, where they jointly worked on an application for a search warrant. Tiedt testified that it was only the second search warrant application which he had prepared, and the first involving a free air sniff by his dog. Initially, the supporting narrative included facts relating to the vehicle stop in western Iowa, but the officers then decided they "didn't need it" because probable cause was established independently by the events at the hotel. The application (Defendant's Exhibit B) states that Henri "gave an immediate change of behavior" on the passenger side of the vehicle, detailing the area between the cab of the truck and the bed of the truck. The application states that Henri "detailed this area for approximately five seconds." The application further states that after Henri did not show any "behavior change" on the vehicle next to the subject vehicle, Tiedt returned to the subject vehicle and "Henri again showed a change of behavior on the passenger side between the cab and the bed of the truck." Again, Henri "detailed the area" for approximately five seconds. The application states that based upon the "two separate

behavior changes," Tiedt called Nolte and "informed him of Henri's positive alert on the vehicle." The application does not explain the difference between an "alert" and an "indication," and does not state that Henri failed to indicate.

After completing the search warrant application, Officer Nolte and Deputy Tiedt went to the county attorney's house for his review. The officers then proceeded to the home of a state judicial magistrate. Finding probable cause, the magistrate issued a search warrant (Defendant's Exhibit A) for the vehicle at 11:18 p.m. The magistrate also authorized the vehicle to be moved to the Williamsburg Fire Department, approximately one and one-half miles from the hotel, to conduct the search.

### 4. The Search

After obtaining the search warrant, Officer Nolte called Special Agent Smith at the hotel. Defendant's vehicle was driven to the fire department. Defendant was also transported to the fire department and was present when the search was conducted. Defendant was apparently placed in handcuffs while being transported, but the handcuffs were removed upon arrival at the fire department.[5] Nolte and Deputy Tiedt proceeded directly to the search location.

The two welder/generators were crated with pallet boards and secured by a chain. The chain was unlocked using a key provided by Defendant from his key chain. Defendant admitted at the hearing that he had locked the chain. A search of the welders yielded more than 250 pounds of marijuana. Defendant was then arrested.

Additional facts as they pertain to the conclusions of law will be set out below.

---

[5] At the instant hearing, Defendant testified that he had a "clear memory" of Special Agent Smith placing him in handcuffs. During his testimony, Smith flatly denied that he used his handcuffs that evening, or that he even saw Defendant in handcuffs. Defendant also testified he was transported to the fire department by Deputy Tiedt. Other credible testimony established, however, that Tiedt was not at the hotel when Defendant was transported.

## IV. DISCUSSION

### A. Was the Vehicle Stop in Western Iowa Unlawful?

Defendant first argues that Trooper Clyde stopped his vehicle in western Iowa without probable cause, in violation of the Fourth Amendment, and therefore the encounter in eastern Iowa was "fruit of the poisonous tree." Defendant concedes that "[u]nder the Fourth Amendment, officers have the authority to pull over a vehicle that has committed 'any traffic violation, however minor,'" citing *United States v. Prokupek*, 632 F.3d 460, 462 (8th Cir. 2011).[6] *See also United States v. Mendoza*, 677 F.3d 822, 827 (8th Cir. 2012) ("When the police observe the driver of a vehicle commit a traffic violation, even a minor one, probable cause exists to stop the vehicle."). Accordingly, if Defendant was driving 73 miles per hour in a 70 mile per hour zone, or following another vehicle more closely than was reasonable and prudent in violation of Iowa Code section 321.307, then Clyde was authorized to stop Defendant's vehicle, notwithstanding his subjective intent. *See Whren v. United States*, 517 U.S. 806, 813 (1996) (the constitutional reasonableness of a traffic stop does not depend on the "actual motivation" of the officer involved).

### 1. Speeding

Trooper Clyde testified that he clocked Defendant on radar traveling 73 miles per hour in a 70 mile per hour zone. Defendant asserts that "this is untrue; Mr. Holleman stated that he had a working cruise-control on the vehicle that was set at 68 miles an hour."[7] When Clyde asked during the stop where he had his cruise control set, Defendant responded "about 68." At the instant hearing, Defendant testified that it was set at 68. The parties stipulated that when the cruise control on the vehicle "is set at 68 mph, the vehicle travels at or near 68 mph, with any variations due to road conditions or grade."[8]

---

[6] Defendant's brief (docket number 21-1) at 2.

[7] *Id.* at 2-3.

[8] Stipulation as to Testing of Vehicle (Defendant's Exhibit II).

In questioning Trooper Clyde's testimony, Defendant notes a discrepancy regarding the location where Clyde employed his radar. In his report (Defendant's Exhibit D), Clyde wrote that he checked the speed of the oncoming vehicle as he was traveling west on I-80 near the 47 mile marker. The GPS on Clyde's vehicle shows he turned around just west of the 43 mile marker, and the video shows he caught up with Defendant just east of the 48 mile marker. Accordingly, *if* he clocked Defendant near the 47 mile marker, then Clyde traveled approximately nine miles in catching up with Defendant, while Defendant only traveled one mile. This is a physical impossibility. At the time of hearing, Clyde acknowledged the error in his report, and testified that he was actually near the 44 mile marker when he first observed Defendant traveling 73 miles per hour. Under this scenario, Clyde traveled approximately six miles in catching Defendant, while Defendant traveled approximately four miles.

Defendant argues that Trooper Clyde's testimony is not "plausible," citing *Prokupek*. There, the trooper told the driver that he was pulled over for not signaling his exit from the Interstate, while acknowledging that he signaled his subsequent turn onto the county road. At the suppression hearing, however, the trooper admitted that he couldn't see where the driver left the Interstate, and testified that he was stopped for failing to signal his turn onto the county roadway. The Court concluded that the trooper's after-the-fact testimony at the suppression hearing was "implausible on its face." 632 F.3d at 463. Reaching a "firm and definite conviction that a mistake has been made," the Eighth Circuit Court of Appeals reversed the district court and ordered the evidence suppressed. *Id.* (quoting *United States v. Pickar*, 616 F.3d 821, 827 (8th Cir. 2010)).

I believe this case is distinguishable from *Prokupek*. There, the inconsistency in the trooper's statements went to the heart of the controversy – the reason why the defendant was pulled over. In this case, however, Trooper Clyde has consistently stated that Defendant was pulled over for driving 73 miles per hour and following too closely. Almost immediately after Defendant entered the squad car, Clyde told him he was stopped

for "a couple reasons." Specifically, Defendant was advised that he was driving "around 73" and was following "too close." In the traffic warning memorandum (Defendant's Exhibit N) issued at the scene, Clyde listed the same two reasons. Clyde's testimony at the suppression hearing was the same. The only inconsistency in Clyde's statements is the indication in his report that Defendant was spotted at the 47 mile marker. As set forth above, that is a clear error, which Clyde corrected in his testimony at the hearing. The inconsistency goes to a collateral matter – where the radar reading occurred. Unlike *Prokupek*, the error does not substantially undermine Clyde's credibility.

Notwithstanding the error found in his report, the Court finds Trooper Clyde to be a credible witness. I believe Clyde when he testified that his radar indicated Defendant was driving 73 miles per hour in a 70 mile per hour zone. When Defendant was told during the stop that he was clocked going 73 miles per hour, he did not immediately deny it. Rather, it was only after Clyde inquired about the use of cruise control, that Defendant claimed he had it set at "about 68." The Court does not believe Defendant is a credible witness.

### 2. *Following Too Close*

The video also supports probable cause to believe Defendant was following a semi too closely immediately prior to the stop. Iowa law prohibits a driver from following more closely than is "reasonable and prudent."[9] While there is no fixed rule to determine precisely what is "reasonable and prudent," Trooper Clyde testified that he was told by "a technical accident investigator" that there should be at least three "white lines" between vehicles at Interstate speeds. In *Lopez v. United States*, 564 F.3d 1001 (8th Cir. 2009), the defendant contended the trooper did not have probable cause to stop him for following

---

[9] Iowa Code section 321.307 states:
> The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway.

too close. In rejecting the claim, the Court concluded that a "two-second rule" utilized by a Nebraska trooper applying a law identical to that found in Iowa "is an appropriate measurement of whether a trailing car is maintaining a reasonable and prudent distance." *Id.* at 1003.[10] By the Court's calculation, a vehicle traveling 70 miles per hour will travel 205.33 feet during two seconds.[11] In other words, at 70 miles per hour, the "2-second rule" requires a vehicle to be at least 205.33 feet behind the vehicle it is trailing. The record is silent regarding the distance represented by "three white lines" and the two spaces between them, but in comparing the length of the pickup truck and the lines on the video recording, it is apparent that the distance is substantially less than 205.33 feet. Accordingly, the "rule of thumb" being applied by Clyde was more favorable to the driver than the rule found to be "an appropriate measurement" by the Eighth Circuit in *Lopez*. Stated otherwise, Defendant was following the semi at a distance less than that represented by the "two-second rule." It should also be recalled that for these purposes it is not necessary that the Government prove a violation of Iowa Code section 321.307 beyond a reasonable doubt; it is only necessary that there be probable cause to believe a violation occurred.

Because Trooper Clyde observed Defendant committing two traffic violations, albeit minor ones, he had probable cause to stop the vehicle. Accordingly, there was no Fourth Amendment violation, and the events in eastern Iowa were not "fruits of the poisonous tree."[12]

---

[10] Other Circuits have also recognized the two-second rule. *See United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005); *United States v. Nichols*, 374 F.3d 959, 965 (10th Cir. 2004).

[11] 70 mph X 5,280 = 369,600 feet/hour, ÷ 3,600 = 102.67 feet/second, X 2 = 205.33 feet traveled in two seconds.

[12] The Government does *not* argue that even if the stop in western Iowa was unlawful, the taint of the illegality had dissipated by the time the search occurred in eastern

(continued...)

### B. Was the Stop Unduly Prolonged?

Next, Defendant argues that the scope and duration of the stop conducted by Trooper Clyde exceeded that permitted by the Fourth Amendment. At the suppression hearing, Defendant's counsel acknowledged that if the stop was lawful, and if Trooper Clyde's suspicions were aroused before it became unduly prolonged, then he was free to contact other law enforcement officers regarding those suspicions, and the eastern Iowa encounter would not be fruit of the poisonous tree. Defendant argues, however, that if the stop was lawful but improperly extended, then any evidence obtained at the location of the stop after it became unduly prolonged (*e.g.*, Defendant's statements or behaviors) should be suppressed.

Defendant begins his argument, as set forth in his brief, by reviewing the history of the jurisprudence in this area. Defendant cites *Florida v. Royer*, 460 U.S. 491, 500 (1983), for the proposition that "[t]he scope of the detention must be carefully tailored to its underlying justification."[13] Opining that more recent developments in federal case law are "difficult to comprehend," Defendant bemoans the "constitutional erosion" in the vehicle stop context, arguably starting with *Whren*, which allows a stop based on a violation of a traffic law, notwithstanding the officer's motives.[14] In Defendant's view, "[s]ubsequent erosion of the Fourth Amendment's protections" followed.[15] According to

---

[12](...continued)
Iowa.

[13] In his brief, Defendant mistakenly identifies *Royer* as a traffic stop based on reasonable suspicion. In fact, Royer was a suspicious individual confronted at an airport.

[14] Defendant's Brief (docket number 21-1) at 5.

[15] *Id.*

Defendant, "[t]he problem with these cases is that they are all seemingly inconsistent with the time-honored two-prong *Terry* analysis."[16]

Notwithstanding Defendant's opinion regarding the wisdom of various Supreme Court cases involving the Fourth Amendment and traffic stops, the law in this regard is well-established.

> [A] constitutionally permissible traffic stop can become unlawful "if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes,* 543 U.S. 405, 407, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005). However, during a traffic stop, an officer may detain the occupants of the vehicle "while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation." *United States v. $404,905.00 in U.S. Currency,* 182 F.3d 643, 647 (8th Cir. 1999). The tasks include "asking for the driver's license, the vehicle's registration, as well as inquiring about the occupants' destination, route, and purpose." *United States v. Sanchez,* 417 F.3d 971, 975 (8th Cir. 2005). If complications arise during these routine tasks, the vehicle may be detained for a longer period of time. *United States v. Olivera–Mendez,* 484 F.3d 505, 510 (8th Cir. 2007). Whether a traffic stop "is reasonable in length is a fact intensive question, and there is no per se time limit on all traffic stops." *Id.*

*United States v. Bowman,* 660 F.3d 338, 343 (8th Cir. 2011).

Here, Trooper Clyde obtained Defendant's driver's license, insurance, and registration, and set about the task of issuing a warning memorandum. Clyde also advised Defendant of the reasons for the stop and asked if he had been using cruise control. While continuing to process the paperwork, Clyde asked if Defendant was delivering the generator/welders to somebody. Clyde asked Defendant if he had ever been arrested, and then called dispatch asking for a check on criminal history and warrants. Clyde also inquired about Defendant's employment. These questions were asked during the first

---

[16] *Id.* at 6.

seven minutes. It appears that Defendant's principal complaint occurs approximately eight minutes into the stop, when Trooper Clyde called EPIC on his cell phone, seeking additional information. This call lasted approximately four and one-half minutes. Less than a minute after the call was completed, Clyde returned Defendant's documentation, had him sign the warning memorandum on the computer screen, and started printing the memorandum. While the document was being printed, Clyde asked Defendant if he traveled with any firearms or controlled substances, which Defendant denied. Clyde then decided to deploy his dog, which extended the stop by less than three minutes.

The facts here resemble those in *United States v. Suitt*, 569 F.3d 867 (8th Cir. 2009). There, the defendant was stopped for speeding and having an expired registration. Three minutes into the stop, the deputy told Suitt that he was going to issue a warning ticket. While writing the warning ticket, the deputy began asking Suitt routine questions about his trip. When asked where he was going, Suitt hesitated and answered that he was heading to Ohio, but could not name the city. Suitt told the officer that he was going to see family, but was vague when asked for specifics. During this time, the deputy observed that Suitt appeared nervous and fidgety. Eight minutes into the stop, the deputy ran a second registration check, having dispatch use its database. Thirteen minutes into the stop, the deputy gave Suitt a warning ticket and returned his driver's license. As Suitt was walking away, the deputy asked whether he had any contraband in his car, which Suitt denied. The deputy asked for permission to search the vehicle, which Suitt refused. The deputy then decided to walk his drug dog around Suitt's vehicle, which alerted to the bed of Suitt's truck. Sixteen minutes into the stop, the deputy opened the bed of the pickup and discovered 32 bales of marijuana.

In affirming Suitt's conviction, the Eighth Circuit concluded that the deputy's routine questions about Suitt's travel plans did not violate the Fourth Amendment. *Id.* at 871. It makes no difference that the questions were asked after the deputy announced his intention to let Suitt go with a warning, and while he was writing the warning ticket. *Id.*

at 872 ("It would be arbitrary to the point of pure caprice if routine questions that would have been plainly related to the stop if asked a few seconds before this announcement lost their nexus to, and became an illegitimate basis for continuing, the detention when asked a few seconds later while Deputy Faiferlick engaged in the necessary process of completing a warning ticket.").

Turning to the facts in the instant action, I believe the routine questions asked by Trooper Clyde during the first seven minutes of the stop – while he was inputting information on the warning memorandum – are permitted under the general guidelines described in *Bowman* and *Suitt*, and did not substantially delay Clyde's completion of the warning memorandum. The same cannot be said of Trooper Clyde's call to EPIC, seeking information regarding license plate checks throughout the country, border crossings, immigration information, or other data. This additional investigation was not "reasonably required" to complete the purpose of the stop. Clyde admitted at the suppression hearing that he only calls EPIC for additional information when he has "some additional suspicion."

The Eighth Circuit has repeatedly recognized that an officer "may extend or expand the scope of a traffic stop beyond the original justification for the stop" in certain instances. *United States v. Peralez*, 526 F.3d 1115, 1120 (8th Cir. 2008). For example, "if the officer develops reasonable suspicion that other criminal activity is afoot, the officer may expand the scope of the encounter to address that suspicion." *Id.* "Whether an officer has reasonable suspicion to expand the scope of a stop is determined by looking at 'the totality of the circumstances, in light of the officer's experience.'" *Sanchez*, 417 F.3d at 975 (quoting *United States v. Carrate*, 122 F.3d 666, 668 (8th Cir. 1997)).

I also find guidance in the recent case of *United States v. Riley*, 684 F.3d 758 (8th Cir. 2012). After stopping a motorist for twice crossing the centerline, the trooper asked questions "about his travel itinerary." *Id.* at 761. After the driver stated that he had been driving from the Hard Rock Casino near Tulsa, Oklahoma, the officer followed up with

questions regarding how long he had been there, what he thought of the hotel, and what floor he had stayed on. The trooper noticed that the defendant seemed very nervous, he was "fidgeting," his heart rate appeared to be elevated, his breathing appeared to be shallow and rapid, and the trooper "could see Riley's pulse in Riley's neck and stomach." *Id.* at 761. (In this case, Trooper Clyde testified that he could see Defendant's stomach "pumping.") When the defendant refused to give consent to search his car, the trooper called for the assistance of a drug detection dog. Because neither of the two dog handlers assigned to the area were on duty, it was necessary to wait 54 minutes for a drug dog to arrive. *Id.* at 761-62. In affirming the defendant's conviction, the Court noted that "asking an off-topic question, such as whether a driver is carrying illegal drugs, during an otherwise lawful traffic stop does not violate the Fourth Amendment." *Id.* at 764 (quoting *United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008)). The Court concluded that Riley's undue nervousness, vague or conflicting answers to simple questions about his itinerary, and misrepresentation regarding his criminal history provided a sufficient basis for the trooper to form a reasonable, articulable suspicion that Riley was engaged in unlawful activity. *Id.* at 764.

Here, Trooper Clyde's suspicions had been aroused by the time he called EPIC. When Clyde initially approached the pickup, Defendant opened his window less than one inch and refused Clyde's request to roll it down further. When Clyde asked Defendant where he was headed, he paused and then answered: "Let's see where was I going to go first . . . Cedar Rapids and then I'm going to, straight to Washington, DC." Defendant told Clyde that one of the generator/welders was his, while "one of them is going back to somebody. Just giving it back." That answer seemed odd, given Defendant's stated destination. Defendant's stated employment also seemed inconsistent with the items ostensibly being delivered cross country. Clyde also noticed that Defendant displayed "heavy breathing" and seemed to show a lot of "nervous energy." Each of these facts may have an innocent explanation; but when considered together, I believe Trooper Clyde's

suspicion that other criminal activity was afoot was reasonable. Accordingly, he was permitted to expand the scope of the encounter to address that suspicion. *Peralez*, 526 F.3d at 1120. The Court also notes that the call to EPIC extended the stop by only four and one-half minutes.

Finally, the Court concludes that the dog sniff did not unreasonably prolong the stop. In *Suitt*, the defendant argued that the dog sniff, after he had declined consent to search his car, was violative of the Fourth Amendment. The Court concluded that "Suitt's argument fails because the dog sniff was neither a search nor a seizure requiring any Fourth Amendment justification. We have repeatedly upheld dog sniffs that were conducted within a few minutes after a traffic stop ended." 569 F.3d at 873. *See also United States v. Alexander*, 448 F.3d 1014, 1017 (8th Cir. 2006) (holding that a dog sniff four minutes after the conclusion of a traffic stop was a *de minimis* extension of the stop and not unreasonable).

## C. Was the Search in Eastern Iowa Unlawful?

After the traffic stop in western Iowa was concluded, Defendant continued driving east on Interstate 80. Defendant exited near Williamsburg, Iowa, and checked into a hotel at approximately 7:40 p.m. Law enforcement officers, who had been alerted to Defendant by Trooper Clyde, observed him exiting the Interstate and checking into the hotel. Defendant was observed leaving the hotel and driving to a nearby restaurant. After Defendant returned to his room, Deputy Tiedt used his drug dog to conduct a free air sniff of Defendant's vehicle. After obtaining a search warrant, the officers searched the vehicle and found more than 250 pounds of marijuana in the generator/welders.

In his brief, Defendant argues the search warrant was invalid for several reasons. Defendant asserts the warrant was "facially deficient," the affidavit was deficient because it failed to identify the dog's qualifications, the affidavit failed to establish probable cause, and the application omitted material facts in violation of *Franks*. While not conceding the merits of Defendant's arguments, counsel for the Government advised the Court in its brief

and at the hearing that the Government is not relying on the validity of the search warrant.[17] Instead, the Government argues that a warrantless search was authorized under the "automobile exception" to the warrant requirement.[18] Defendant responds that probable cause is still lacking and, because of the *Franks* violations, the Government cannot simply abandon the warrant and fall back on the automobile exception.

### 1. *The Automobile Exception*

The Fourth Amendment protects persons against unreasonable searches and seizures. Warrantless searches are *per se* unreasonable, with a few well-established exceptions. *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005). "The so-called 'automobile exception' permits police to conduct a warrantless search of an automobile if, at the time of the search, they have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *Id.* at 1140-41. The Government bears the burden of establishing that the exception applies here. *Id.* at 1140.

In asserting the validity of the search, the Government argues that probable cause was established by Deputy Tiedt's conclusion that his dog, Henri, alerted twice to the presence of drugs in the vehicle. (It should also be recalled that the officers had knowledge of Defendant's suspicious statements and behaviors while he was stopped by Trooper Clyde in western Iowa.) Defendant questions Tiedt's credibility regarding the dog sniff, and further argues that Henri's alleged change in behavior does not establish probable cause.

Defendant apparently concedes that if a properly trained and reliable drug dog signals the presence of drugs, then probable cause exists for a lawful search. *See United States v. Winters*, 600 F.3d 963, 967 (8th Cit. 2010) ("an alert or indication by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person

---

[17] *See* Government's Brief (docket number 29-1) at 2.

[18] *See* Transcript of July 13, 2012 Hearing (docket number 44), 59:11-60:8.

or for the search of a vehicle"). The fighting issue is what signal is required. Is the dog required to "indicate," consistent with his training? Is it enough if the dog "alerts," demonstrating to his handler the presence of drugs? Is a "change of behavior" or a "show of interest" enough?

The difficulty in analyzing the cases includes the lack of uniformity regarding the applicable terms and, in some cases, a lack of precision in that regard. For example, the Court in *Winters* stated that "an alert or indication" will establish probable cause to search a vehicle. *Id.* at 967. When describing the facts, the Court stated that the dog "detected" drugs in the vehicle and "[t]he dog indicated (specifically identified) the odor of narcotics emanating from Winters." *Id.* at 966. A review of the videotape in *Winters* reflected the dog "generally alerted to the Firebird and then specifically indicated outside the passenger door of the patrol car, where Winters was sitting." *Id.* at 967. The Court concluded that the search of the vehicle was constitutionally reasonable because "the totality of the circumstances including [the dog's] general alert provided probable cause to search." *Id.* at 968. While it did not focus on the differences between an "alert" and an "indication," the Court apparently recognized a distinction, and concluded the dog's "general alert" provided probable cause to search.

The terms appear to be used somewhat differently in *United States v. Jacobs*, 986 F.2d 1231 (8th Cir. 1993). There, a drug dog was taken to a Federal Express office to sniff a suspicious package. The dog "showed an interest in the defendant's package by pushing it around with his nose and scratching it twice." *Id.* at 1233. "This action did not amount to an official 'alert,' however, so the dog's handler was not sure that the package contained drugs." *Id.* In applying for a search warrant, officers advised the magistrate that the dog "exhibited an interest" in the package, underlining "interest." *Id.* at 1234. The defendant argued that the officers were attempting to mislead the magistrate "by emphasizing the word in such a fashion as to equate it with the term of art 'alert.'" *Id.* The Court rejected the defendant's argument, however, finding that it was equally likely

that by underlining the word "interest," the officer "was indicating, at least to some readers, that an alert did not occur." *Id.* The Court found that the information provided by Arizona authorities (where the package originated) coupled with the dog's "interest" in the package, might have provided reasonable suspicion that it contained contraband, but more was needed to provide probable cause to search. In finding that probable cause was lacking, the Court noted that "the dog had not given its trained response when confronted with a package containing drugs" and the dog's handler admitted "that he could not say with certainty that drugs were in the package." *Id.*

Turning to the facts in the instant action, Deputy Tiedt described the free air search in detail. Tiedt started by having Henri sniff four other vehicles, during which time Henri did not show any change in behavior. Tiedt then directed Henri's attention to Defendant's vehicle, starting in the front and proceeding in a counterclockwise direction. When Henri reached the passenger side of the vehicle, he "stopped dead in his tracks" and "detailed" the area between the bed and the cab by closing his mouth and exhibiting "really intense sniffing to where you can actually hear him sniffing the vehicle and just going up and down the seam trying to figure out where the odor was coming from." Henri did not, however, sit down – *i.e.*, "indicate" – as he is trained to do when detecting narcotics. After approximately five seconds of exhibiting this behavior, Tiedt pulled Henri off and directed his attention to the next vehicle. After Henri showed no change of behavior when sniffing the next vehicle, Tiedt then returned to Defendant's vehicle. Tiedt repeated the process and Henri again "alerted" at the same location, but did not "indicate."

I believe the facts here are distinguishable from those in *Jacobs*. Henri did not merely "show an interest" in Defendant's vehicle, but instead "detailed" the area between the door and the bed of the pickup on the passenger side. Henri twice exhibited the same behavior in the same area. Unlike the dog handler in *Jacobs*, Deputy Tiedt testified that based on Henri's change of behavior, he was convinced that Henri had detected the odor of narcotics. If a dog clearly signals the presence of narcotics, his failure to "indicate" as

trained is not fatal to a finding of probable cause. *See United States v. Clayton*, 374 Fed. Appx. 497, 502 (5th Cir. 2010) ("Although [the dog] did not passively indicate or sit in this instance, our Fourth Amendment jurisprudence does not require drug dogs to abide by a specific and consistent code in signaling their sniffing of drugs to their handlers."). The critical issue is not whether Henri "alerted" or "indicated," but whether his change of behavior, together with the totality of the circumstances, provided probable cause to believe that drugs could be found in the vehicle.

I find Deputy Tiedt is a credible witness. While the free air sniff was not videotaped, and there were no other observers to the activity, I have no reason to doubt Tiedt's veracity. If Tiedt was inclined to fabricate evidence in this case, he could have simply asserted that Henri indicated the presence of drugs by sitting down. Instead, Tiedt testified – I believe truthfully – that the dog alerted to the presence of narcotics but did not indicate as trained. Tiedt opined that given the large amount of marijuana discovered, Henri may have been "overwhelmed," and was having difficulty pinpointing the precise source of the odor.

I also conclude that the change in behavior exhibited by Henri, as interpreted by his handler, Deputy Tiedt, provided probable cause for a warrantless search of the vehicle.[19] Tiedt was trained in interpreting Henri's behaviors and body language and had worked with him for two and one-half years prior to this incident. While Henri failed to sit upon detecting the odor of narcotics, Tiedt recognized his change of behavior as evidence that the odor of narcotics had been detected. Given the totality of the circumstances, including the facts known to the officers regarding the stop in western Iowa, there was probable cause to believe that drugs would be found in Defendant's vehicle. Accordingly, a warrantless search was authorized under the "automobile exception."

---

[19] "If probable cause justifies the search of [a] lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Olivera-Mendez*, 484 F.3d 505, 512 (8th Cir. 2007) (quoting *United States v. Ross*, 456 U.S. 798, 825 (1982)).

### 2. *Properly Trained and Reliable Drug Dog*

Defendant further argues that even if Henri adequately signaled the presence of narcotics in Defendant's vehicle, probable cause could not be established due to Henri's unreliability. "A dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance if the dog is reliable." *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999). To establish the dog's reliability in applying for a search warrant, "the affidavit need only state the dog has been trained and certified to detect drugs." *Id.* The same standard applies for a warrantless search based on a dog sniff. *United States v. Olivera-Mendez*, 484 F.3d 505, 512 (8th Cir. 2007) ("The standard is no more demanding where police search an automobile based on probable cause without a warrant."). Here, it is undisputed that Henri was trained and certified in October 2009, and was tested and recertified annually thereafter.[20]

The Court must also consider evidence, however, which may detract from the dog's reliability. *Winters*, 600 F.3d at 967 ("Contrary evidence 'that may detract from the reliability of the dog's performance properly goes to the credibility of the dog.'") (quoting *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994)). Prior to this incident, Henri had been deployed 78 times in the field, 64 of which were narcotics related.[21] On 23 of the 64 deployments, Henri "alerted" to the presence of narcotics. Of those 23 times when Henri alerted, he also "indicated" on 17 occasions. On the 6 occasions when Henri alerted, but did not indicate, drugs were found each time. For example, on March 8, 2010, after Henri alerted on the trunk of a vehicle, the driver admitted to marijuana being in the

---

[20] *See* Government's Exhibit 2.

[21] Henri's "use reports" prepared by Deputy Tiedt were introduced as Government's Exhibit 4.

vehicle. A search revealed 33 pounds of marijuana.[22] Henri had similar results on August 9, 2010, January 24, 2011, April 19, 2011, October 24, 2011, and April 11, 2012.[23]

Defendant notes, however, that on the 17 occasions when Henri "indicated," drugs were found only 7 times. On one of the occasions when no drugs were found, Deputy Tiedt was called away for an accident and no search was conducted.[24] On two occasions, full searches of the vehicles and their contents were not completed for other reasons.[25] It is also impossible to know whether, when giving a "false positive," Henri was indicating to a residual odor of drugs. For example, on November 9, 2009, Henri was deployed after a driver who was stopped for weaving seemed "overly nervous" and denied consent to a search. Henri indicated to the driver's door. There were "marijuana insignia" throughout the vehicle and several sticks of deodorant were found in the map pockets of the doors, but no drugs were located. The driver was on probation for manufacturing and possession of marijuana.[26] Henri may have responded to the residual odor of marijuana from an earlier time.

On the 23 occasions when Henri alerted in the field to the presence of narcotics – including the 17 times when he also "indicated" – drugs were found 13 times, or approximately 57% of the time. On the 10 times when no drugs were found, a possible explanation is provided in at least some instances. In *United States v. Donnelly*, 475 F.3d 946 (8th Cir. 2007), the Court addressed the issue of probable cause based on a dog with a similar performance record. There, non-trace quantities of drugs were discovered at

---

[22] *See* K-9 Use Report, Government's Exhibit 4 at 454.

[23] *See Id.* at 463, 475, 483, 494, and 500.

[24] *See Id.* at 480.

[25] *See Id.* at 435 and 467.

[26] *See Id.* at 443.

least fifty-four percent of the time the dog positively indicated their presence in the field.[27] *Id.* at 955. After taking into account the totality of the circumstances, including the defendant's behavior, the dog's history and pedigree, and the dog's positive indication of drugs within the vehicle, the Court concluded that "there was a fair probability that Donnelly's vehicle contained drugs." *Id.* ("Although Baron may not be a model of canine accuracy, his record is only one of the factors we consider in the totality of the circumstances calculation.") Turning to the instant action, the "ultimate issue" is whether there was probable cause to believe that Defendant's vehicle contained controlled substances. *Winters*, 600 F.3d at 968. Even given Henri's less than perfect performance in the field, I nonetheless conclude, based on the totality of the circumstances, that probable cause existed here.

### 3. *Trespass*

Defendant next argues that the free air sniff was unlawful because Deputy Tiedt and his dog "committed a trespass onto private property."[28] To analyze this issue, it is necessary to take a closer look at the area where the sniff occurred. The Super 8 Motel where Defendant stopped for the night is located off a county road approximately one mile from the Interstate.[29] An aerial photograph of the hotel and a nearby house was introduced as Defendant's Exhibit Z. A short driveway leads immediately to the hotel parking lot. Continuing on the driveway, past the parking lot, leads one to a private residence. A sign on the driveway, immediately prior to the entrance to the parking lot, states "private

---

[27] The opinion is imprecise regarding whether "positively indicated" refers in a formal sense to the dog demonstrating a trained response to the presence of narcotics, or simply "alerting" to the presence of narcotics.

[28] The Government asserts Defendant waived this argument by failing to make it in his motion and initial brief. The Court will, nonetheless, address the issue on its merits.

[29] It is unclear to the Court whether the hotel is branded a "Super 8" or a "Best Western." *Compare* Defendant's Exhibit X with Defendant's Exhibit AA.

drive."[30] On the far end of the driveway, past the parking lot to the hotel, is another sign which reads "Private Drive – Do Not Block."[31] Defendant argues that "[a] hotel parking lot is more akin to a personal, private driveway in this scenario because the Defendant is residing in the hotel, and a hotel driveway is meant for the vehicles of their patrons and not the general public."[32] The Government argues that Defendant had no reasonable expectation of privacy in the commercial parking lot of a hotel.

As noted by Defendant in his brief, the "touchstone" of Fourth Amendment analysis has been the question of whether a person has a "constitutionally protected reasonable expectation of privacy." *Oliver v. United States*, 466 U.S. 170, 176 (1984). The reasonable expectation of privacy one has while staying in a hotel room was addressed by the Court in *United States v. Williams*, 521 F.3d 902, 905 (8th Cir. 2008). Noting that "[i]n order to have a legitimate expectation of privacy, the defendant must show (1) a subjective expectation of privacy and (2) the expectation is objectively reasonable," the *Williams* Court concluded that persons have a reasonable expectation of privacy in their hotel room. *Id.* at 905-06.

The Government argues that a reasonable expectation of privacy in a hotel room – "where the guest has the ability to restrict access to outsiders" – is substantially different from an open parking lot where the guest has no control over the comings and goings of others.[33] The Courts have recognized a distinction between commercial and residential property. "It is a fair generalization that business and commercial premises are not as private as residential premises, and that consequently there are various police investigative procedures which may be directed at such premises without the police conduct constituting

---

[30] *See* Defendant's Exhibits X and Y.

[31] *See* Defendant's Exhibit EE.

[32] Defendant's Reply to Government's Resistance (docket number 52) at 12.

[33] Government's Second Supplemental Brief (docket number 70) at 6.

a Fourth Amendment search." W. LaFave, *Search and Seizure* (4th Ed.), § 2.4(b) at p.627 (cited with approval in *United States v. Reed*, 733 F.2d 492, 501 (8th Cir. 1984)).

Here, there is no evidence that Defendant had a subjective expectation of privacy in the hotel parking lot. While Defendant testified at the suppression hearing, he did not testify that he saw the "private drive" sign, or that he placed any reliance on the sign. Even *if* Defendant had a subjective expectation of privacy, however, the Court concludes that such expectation was not objectively reasonable. While most hotel parking lots are presumably private property and, as such, are under the control of the owners, it can be reasonably expected that persons will come and go. This is true notwithstanding the presence of a "private drive" sign. *See United States v. Edmonds*, 611 F.2d 1386, 1388 (5th Cir. 1980) (finding no Fourth Amendment violation when officers ignored a "no trespassing" sign on the entrance road leading to a private dock which was accessible to the public).

Unlike a hotel room which may be locked by the occupant and shielded from public view, one using a hotel parking lot cannot reasonably expect that it will not be accessible by others. It may be the owners of the hotel could have asked Deputy Tiedt, who was not a guest of the hotel, to vacate the premises. That does not mean, however, that Defendant had a reasonable expectation of privacy in the parking lot. In *United States v. Roby*, 122 F.3d 1120 (8th Cir. 1997), the Court considered the issue of whether a canine sniff in the common corridor of a hotel intruded upon a legitimate expectation of privacy. *Id.* at 1124. The Court concluded that the occupant of the room had no reasonable expectation of privacy in the hallway.

> Mr. Roby had an expectation of privacy in his Hampton Inn hotel room. But because the corridor outside that room is traversed by many people, his reasonable privacy expectation does not extend so far. Neither those who stroll the corridor nor a sniff dog needs a warrant for such a trip. As a result, we hold that a trained dog's detection of odor in a common corridor does not contravene the Fourth Amendment.

*Id.* at 1125. The Sixth Circuit Court of Appeals reached the same conclusion regarding a motel parking lot. *See United States v. Diaz*, 25 F.3d 392, 396 (6th Cir. 1994) (rejecting the defendant's argument that "even if the dog sniff adequately established probable cause, the sniff and search were fruits of an unlawful entry into the parking lot, because his car was in that part of the lot reserved for motel guests and thus he had a reasonable expectation of privacy"). As the Court famously said in *Katz v. United States*, 389 U.S. 347, 351 (1967), ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.").

### D. Does a *Franks* Violation Preclude Reliance on the Automobile Exception?

Acting on Henri's alerting to the presence of narcotics in Defendant's vehicle, Deputy Tiedt and Officer Nolte sought and obtained a search warrant for the vehicle. The Government is not defending the validity of the search warrant, however, nor does it claim a *Leon* good faith exception to the exclusionary rule.[34] Instead, the Government argues that a warrantless search was authorized under the automobile exception. Defendant argues that the Government can't "save" a search conducted pursuant to a warrant by asserting alternative grounds. Specifically, Defendant claims that when seeking the search warrant the officers committed a *Franks* violation and, as an appropriate sanction, evidence obtained during the search must be suppressed.

#### 1. Alleged *Franks* Violation

The Court will first address whether a *Franks* violation occurred. In *Franks v. Delaware*, 438 U.S. 154 (1978), officers sought and obtained a warrant to search a suspect's apartment. The supporting affidavit contained allegedly false statements regarding conversations the affiant had with the suspect's employer. The Supreme Court of Delaware held that no attack upon the veracity of a warrant affidavit could be made. *Id.* at 161. The Supreme Court reversed, concluding that information in an affidavit must be "'truthful' in the sense that the information put forth is believed or appropriately

---

[34] *United States v. Leon*, 468 U.S. 897 (1984).

accepted by the affiant as true." *Id.* at 165. The defendant is entitled to an evidentiary hearing upon allegations, accompanied by an offer of proof, of "deliberate falsehood or of reckless disregard for the truth." *Id.* at 171. Allegations of negligence or innocent mistake are insufficient, and no hearing is required "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side there remains sufficient content in the warrant affidavit to support a finding of probable cause." *Id.* at 171-72. The same analysis applies to omissions of material fact. "The defendant must show that the facts were omitted with the intent to make, or in reckless disregard of whether they thereby make, the affidavit misleading." *United States v. Clapp*, 46 F.3d 795, 799 (8th Cir. 1995).

Here, Defendant argues that when submitting the search warrant application to the state judicial magistrate, the officers recklessly omitted three key pieces of information.[35] First, Defendant asserts the officers failed to inform the magistrate "that a previous dog had sniffed the vehicle three times and failed to alert or indicate to the odor of narcotics." Second, Defendant argues that the magistrate was not informed that Henri "only showed an interest in the vehicle, as interpreted by the dog handler alone, without engaging in the specific behavior the dog is trained to perform when the odor or narcotics is present." Third, Defendant claims the affiants recklessly failed to inform the magistrate regarding Henri's poor prior performance in the field.[36]

The Court believes Defendant's first claimed *Franks* violation may be disposed of on the facts. Credible evidence established that a valid free air sniff was *not* conducted by Trooper Clyde's dog in western Iowa. The dog was distracted by a nearby dead animal, and did not "work" the vehicle. Furthermore, it cannot be said the affiants were "reckless" in omitting information regarding the stop in western Iowa. The officers

---

[35] *See* Defendant's Reply Brief (docket number 52) at 8.

[36] In his reply brief, Defendant asserts a fourth item of "omitted key information," which is substantially the same as the second item listed.

believed the events in western Iowa were independent of the events in eastern Iowa, and were not, therefore, relevant to a determination of probable cause. Even if the officers erred in their analysis of the importance of the western Iowa stop, I do not believe the omission was made recklessly. Even *if* one concludes that the officers recklessly omitted information regarding the western Iowa stop from the search warrant application, the evidence must be suppressed "*only* if the affidavit as supplemented by the omitted material *could not* have supported the existence of probable cause." *Jacobs*, 986 F.2d at 1235. (*italics* in original). If the search warrant affidavit had been supplemented to include information that Defendant had been stopped in western Iowa and the dog failed to sniff the vehicle, such information would not have prevented a finding of probable cause based on the events in Eastern Iowa.

The second *Franks* violation alleged by Defendant is Deputy Tiedt failing to inform the judicial magistrate that Henri "only showed an interest in the vehicle," as opposed to "engaging in the specific behavior the dog is trained to perform when the odor of narcotics is present." The affidavit advises the magistrate that upon approaching Defendant's vehicle, "Henri gave an immediate change of behavior on the passenger side of the vehicle. At the passenger side door Henri immediately stopped and detailed the area between the cab of the truck and the bed of the truck. Henri detailed this area for approximately five seconds."[37] The affidavit states that Henri was then "pulled off." The affidavit further states that after sniffing another vehicle and then returning to the subject vehicle, "Henri again showed a change of behavior on the passenger side between the cab and the bed of the truck. This time Henri again detailed the area for approximately five seconds." Based upon these "two separate behavior changes," Tiedt informed Officer Nolte of "Henri's positive alert on the vehicle." Tiedt also informed Nolte that "based on Henri's actions your affiant believed narcotics to be in the vehicle." Finally, the affidavit concludes that "[b]ased on your affiants training and experience in handling a certified

---

[37] Application for Search Warrant, Attachment A (Defendant's Exhibit B).

drug detection K-9 your affiant believes there is probable cause to believe there is narcotics in the above stated vehicle." The affidavit does not advise the magistrate that when Henri detects the odor of narcotics, he is trained to sit down, but did not do so here.

As discussed in more detail above, when considering the totality of the circumstances, probable cause to believe drugs are located in a vehicle may be found on something less than an "indication" by the dog. That is, an "alert" – as demonstrated by Henri both times he sniffed Defendant's vehicle – may provide probable cause when considered in conjunction with all of the other circumstances. In *Jacobs*, the Court did not find a *Franks* violation when the affiant advised the magistrate that the dog showed an interest in the package – underlining the word "interest" – but did not tell the magistrate the dog had not given a "full alert" to the package. 986 F.2d at 1234. Rather, the *Franks* violation in *Jacobs* occurred when the affiant failed to notify the judicial magistrate that the dog handler "could not say with certainty that drugs were in the package" and a second K-9 sniff was negative. *Id.* at 1235. Here, Tiedt was convinced that Henri had detected the odor of narcotics coming from Defendant's vehicle, and there was no second negative dog sniff. Even if Tiedt recklessly omitted information that Henri failed to "indicate," its inclusion in the affidavit would not have prevented a finding of probable cause.

Finally, Defendant argues a *Franks* violation occurred when Deputy Tiedt failed to advise the judicial magistrate regarding Henri's performance record. In fact, the affidavit fails to make any allegation regarding Henri's qualifications – whether good, bad, or indifferent. That omission was one of the principal reasons why Defendant argued the search warrant was invalid. Again, there is no showing that Tiedt intentionally omitted the information. Tiedt testified that this was only his second search warrant application, and the first application involving Henri. If Tiedt failed to include information regarding Henri's qualifications as a result of "negligence or innocent mistake," then no *Franks* violation occurred. *Franks*, 438 U.S. at 171. "Recklessness, however, may be 'inferred from the fact of omission of information from an affidavit when the material omitted would

have been clearly critical to the finding of probable cause.'" *United States v. Mashek*, 606 F.3d 922, 928 (8th Cir. 2010) (quoting *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986)). As set forth above, I believe probable cause existed based on the totality of the circumstances, notwithstanding Henri's tepid record. It necessarily follows that recklessness cannot be inferred because the omitted material was not "clearly critical" to the finding of probable cause.[38] Furthermore, if the affidavit was supplemented to include information regarding Henri's field performance, it would not have prevented the finding of probable cause. *Jacobs*, 986 F.2d at 1235.

In summary, I believe Deputy Tiedt and Officer Nolte did not commit a *Franks* violation in applying for the search warrant and, therefore, the evidence would not be suppressed on that basis. Defendant's claim of a prior negative dog sniff is not supported by the evidence. While the magistrate was not told that Henri failed to show his trained response to the odor of narcotics, the affidavit provided a detailed description of Henri's change of behavior which convinced Tiedt that Henri detected the presence of narcotics. Even if the affidavit was supplemented to advise the magistrate that Henri failed to "indicate," I do not believe it would have prevented the magistrate from finding probable cause based on a totality of the circumstances. Finally, while Tiedt's failure to include any allegation regarding Henri's qualifications was fatal to the validity of the warrant, I do not believe his omission of Henri's field performance was intentional or reckless, nor do I believe its inclusion in the affidavit would have precluded a finding of probable cause. Accordingly, *if* the search warrant was otherwise valid, I do not find any *Franks* violation which would require suppression of the evidence.

---

[38] As the Government apparently concedes, however, an allegation that Henri was trained and certified to detect the odor of narcotics *was* critical to a finding of probable cause.

## 2.    *Requested Sanction*

As set forth above, if the search warrant had been otherwise valid, I do not believe there was a *Franks* violation requiring suppression of the evidence.  *If* the district court disagrees with my analysis in this regard, however, then it is necessary to consider whether *Franks* requires suppression of the evidence when the Government is not relying on the validity of the warrant, but asserts the evidence was obtained lawfully on alternative grounds.  That is, the Government argues that even if a *Franks* violation would preclude the introduction of evidence obtained pursuant to a search warrant, it does not prevent the introduction of evidence lawfully obtained under the automobile exception.  Defendant argues that if there was a *Franks* violation, then the Government cannot rely on an alternative theory to search, and the evidence must be suppressed.

In support of its argument, the Government cites *United States v. Martinez*, 78 F.3d 399 (8th Cir. 1996).  In that case, authorities obtained and executed a search warrant at the defendant's residence.  They called a drug dog to the scene, which gave a "positive indication" that drugs were present in two vehicles parked nearby.  Based on the dog sniff, the officers obtained a second search warrant for the vehicles.  Marijuana, cocaine, and two firearms were found in one of the vehicles.  The defendant moved to suppress the evidence found in the vehicle, arguing that "the application for a search warrant was insufficient because it did not indicate that Radar was trained to sniff drugs or that he had indicated that drugs were present and because it did not detail Radar's track record."  *Id.* at 400-01.  Apparently, 11 of Radar's previous 12 indications had been erroneous.  *Id.* at 401.  The Court concluded that even if the warrant was invalid, the search was authorized under the automobile exception.

> [W]e find that probable cause existed for the search
> notwithstanding any deficiencies regarding Radar's reliability
> as a drug dog.  Once probable cause has been established,
> authorities may search a car without a warrant under the
> automobile exception, although the better practice is to obtain
> a warrant.

. . .

> Because probable cause existed for the search and the warrant
> was unnecessary, the search was valid.

*Martinez*, 78 F.3d at 401.

Accordingly, *Martinez* makes it clear that if law enforcement obtains a search warrant which is subsequently determined to be invalid, the search may be authorized nonetheless under the automobile exception. In other words, the Government may fall back on a warrantless search under the automobile exception when the search warrant is subsequently determined to be invalid. Defendant argues that *Martinez* is inapplicable when the warrant's invalidity is based on a *Franks* violation, rather than the mere failure to sufficiently allege probable cause in the warrant application.

Defendant's argument suggests that to deter police misconduct – in this case recklessly omitting material information from a search warrant application – evidence obtained pursuant to the warrant must be suppressed, even if the evidence would have been otherwise admissible if the police had not sought a warrant. Defendant cites *Franks* in support of his argument. It should be noted, however, that the *Franks* Court did *not* hold that evidence will be suppressed simply upon a showing of an affiant's intentional or reckless wrongdoing. Rather, if the affidavit supports a finding of probable cause after the deliberately false or reckless statements are set aside, then the evidence will not be suppressed. *Franks*, 438 U.S. at 171-72. Similarly, evidence will not be suppressed simply because a law enforcement officer deliberately or recklessly omits material information. In reaching this conclusion, the Court carefully addressed the "competing values" in determining when the exclusionary rule should apply. *Id.* at 165-71.

The Supreme Court has stated that the "social costs" of the exclusionary rule present a "high obstacle" for those urging its application.

> Suppression of evidence has always been our last resort, not
> our first impulse. The exclusionary rule generates "substantial
> social costs," which sometimes includes setting the guilty free

and the dangerous at large. We have therefore been "cautious against expanding" it, and have "repeatedly emphasized that the rule's 'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging its application." We have rejected "indiscriminate application" of the rule, and have held it to be applicable only "where its remedial objectives are thought most efficaciously served" – that is, "where its deterrence benefits outweigh its 'substantial social costs.'"

*Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (internal citations omitted).

The Court recently reemphasized the same point.

Real deterrent value is a "necessary condition for exclusion," but it is not "a sufficient" one. The analysis must also account for the "substantial social costs" generated by the rule. Exclusion exacts a heavy toll on both the judicial system and society at large. It almost always requires courts to ignore reliable, trustworthy, evidence bearing on guilt or innocence. And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment. Our cases hold that society must swallow this bitter pill when necessary, but only as a "last resort." For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.

*Davis v. United States*, ___ U.S. ___, 131 S. Ct. 2419, 2427 (2011) (internal citations omitted).

As described in more detail above, I believe that probable cause existed to search Defendant's vehicle and, therefore, the warrant was "unnecessary." Accordingly, as the Court held in *Martinez*, even if the warrant is determined to be invalid, the search is nonetheless authorized under the automobile exception. Even if the search warrant affidavit recklessly omitted material information – and I do *not* make that finding here – the holding in *Franks* would not preclude the admission of evidence lawfully obtained by other means. The Court in *Hudson* made it clear that "exclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence." 547 U.S. at 592. "[B]ut-for causality is only a necessary, not a sufficient, condition for

suppression." *Id.* Here, Defendant is unable to establish even the minimal "but-for" requirement. Because the search was authorized under the automobile exception, it cannot be said that the evidence would not have been obtained "but-for" the warrant. Accordingly, because the warrant was unnecessary and the search was otherwise authorized by the automobile exception, any *Franks* violation which occurred in the application for the warrant would not trigger the exclusionary rule.

### E. Was Defendant Unlawfully Detained and Questioned?

Finally, Defendant claims that he was unlawfully detained and questioned. After Henri alerted twice to the odor of narcotics coming from Defendant's vehicle, Task Force Officer Nolte and Special Agent Smith proceeded to Defendant's hotel room. They identified themselves as law enforcement officers and asked to enter the room to speak with Defendant regarding his vehicle. Defendant refused. Defendant testified at the hearing that the officers then asked if he could come down to the parking lot and speak with them and he said "okay." Defendant, who was dressed in his pajamas, put on his shoes and took his keys, wallet, and cell phone with him. After they arrived at the parking lot, Deputy Tiedt advised Defendant that a drug dog had alerted to the presence of narcotics in the truck. Defendant was patted down, told to empty the contents of his pockets on the hood of the truck, and was asked for permission to search the vehicle. Defendant refused.

Defendant testified that he did not ask to go back inside the hotel, but "was under the impression that I was being held there." According to Defendant, the officers "gave me kind of a hard stare," which he found "a little bit intimidating." After Deputy Tiedt and Officer Nolte left to seek a search warrant, Agent Smith asked Defendant if the welding units were his, and he replied that they were. When Smith then asked Defendant where he acquired them and how much he paid for them, Defendant stated that before he answered any more questions he would like to speak to his attorney. Defendant then made a call on his cell phone. Smith could hear Defendant's side of the conversation.

Defendant said "I'm in Williamsburg, Iowa; they've come for me at the hotel; do you understand you need to call the attorney; you need to call the attorney." Smith told Defendant that it was "unfortunate" that he had made the phone call, because it would likely prevent any possible cooperation. Smith did not ask Defendant any further substantive questions after that time.

Special Agent Smith, Defendant, and two other officers waited in the hotel parking lot for approximately two hours while Deputy Tiedt and Officer Nolte obtained a search warrant. Defendant was not handcuffed at that time and was sitting on the curb or on the passenger side inside his vehicle. Defendant did not ask to leave and was not told that he could not leave. Defendant did not ask to use the bathroom. After the search warrant was obtained, Defendant was apparently placed in handcuffs and transported to the fire department, where the search would occur. Defendant's handcuffs were apparently removed upon arrival at the fire station and he observed the search while sitting in a chair nearby. Defendant was not questioned while at the fire station. After the drugs were found, Defendant was arrested and transported to jail.

### 1.    Seizure

The Court will first address the issue of whether Defendant was unlawfully seized when he responded to the officers' request that he come out to the parking lot. "[N]ot all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry v. Ohio*, 392 U.S. 1, 20 n.16 (1968). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* The footnote in *Terry* was reinforced by the Court in *United States v. Mendenhall*, 446 U.S. 544, 553 (1980) ("We adhere to the view that a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained.").

On the same day it decided *Terry*, the Court also decided *Sibron v. New York*, 392 U.S. 40 (1968). There, Sibron was sitting in a restaurant eating pie and drinking coffee

when a policeman approached him and told him to come outside. *Id.* at 45. Sibron complied. The Court was not required to determine whether Sibron was "seized" inside the restaurant, and noted that the record was silent regarding "whether Sibron accompanied patrolman Martin outside in submission to a show of force or authority which left him no choice, or whether he went voluntarily in a spirit of apparent cooperation with the officer's investigation." *Id.* at 62. In *Mendenhall*, however, the Court stated that if Sibron went voluntarily with the officer, then no seizure occurred. *Mendenhall*, 446 U.S. at 553 ("Plainly, in the latter event, there was no seizure until the police officer in some way demonstrably curtailed Sibron's liberty."). Turning to the facts in the instant action, I believe credible evidence establishes Defendant voluntarily accompanied the officers to the parking lot in response to their request. That is, Defendant was not "seized" when he left the hotel room.

Defendant asserts he did not feel free to leave the parking lot and return to his hotel room, citing a "hard stare" by officers and a general feeling on his part. Defendant admits, however, that he was never told he could not return to his room, nor did he ever ask. It should be noted that "[t]he subjective intent of the seizing officer is irrelevant if not communicated to the suspect." *United States v. Bloomfield*, 40 F.3d 910, 916 (8th Cir. 1994) (citing *Mendenhall*, 446 U.S. at 554 n.6). Accordingly, the Court concludes Defendant was not "seized" while he waited in the parking lot for Deputy Tiedt and Officer Nolte to obtain the search warrant.

The Government concedes Defendant was seized when he was placed in handcuffs and transported to the fire station for the search. The Government argues that Defendant's seizure while the search was being conducted is authorized by *Michigan v. Summers*, 452 U.S. 692 (1981). It would seem the issue is largely academic, however, because no incriminating evidence was obtained from Defendant between the time he was seized and when he was subsequently arrested.

## 2. Questioning

Defendant notes he was not *Mirandized* while in the hotel parking lot, and asks that any statements made by him be suppressed.[39] The *Miranda* protections apply only to custodial interrogations. *United States v. Sanchez*, 676 F.3d 627, 630 (8th Cir. 2012). In determining whether an interrogation is "custodial," the Court applies a nonexclusive, six-factor test:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Sanchez*, 676 F.3d 627, 630 (8th Cir. 2023) (citing *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990)).

Here, Defendant voluntarily agreed to accompany the officers to the parking lot at their request. However, Defendant was not specifically told that he was free to return to his room. The questioning (one question) took place in a hotel parking lot and was not "police dominated."[40] Special Agent Smith did not use any "strong arm tactics or deceptive stratagems" when he asked Defendant if he owned the generator/welders.

---

[39] It is the Court's understanding that the only substantive question answered by Defendant at that time was in response to Special Agent Smith's question regarding whether he owned the generator/welders.

[40] When Special Agent Smith questioned Defendant regarding ownership of the welder/generators, Deputy Tiedt and Officer Nolte had already left the scene, and there is no indication that the other officers were nearby.

Defendant was not placed under arrest at the termination of the questioning, but was only arrested later when drugs were found in his vehicle. After considering all of the facts and circumstances, including the factors set forth in *Sanchez*, the Court concludes Defendant was not in custody when questioned in the parking lot by Smith, and a reading of his *Miranda* rights was not required.

### 3.     Search of the Hotel Room

Following his arrest, officers asked Defendant whether he wanted them to retrieve his personal belongings from the hotel room. Defendant responded affirmatively and signed a written consent authorizing the officers to search the room. *See* Defendant's Exhibit G. In his brief, Defendant asserts that his consent to search was not voluntary. It is the Court's understanding, however, that when the officers went to the hotel room, no contraband or other incriminating evidence was found. Accordingly, the Court will not further prolong this report by discussing an issue which is merely academic.

## V. SUMMARY

In summary, the Court concludes that Defendant's vehicle was lawfully stopped in western Iowa after a state trooper observed him driving 73 miles per hour in a 70 mile per hour zone and following another vehicle too closely. While the vehicle stop was prolonged when the trooper called a national database seeking information not reasonably required to complete the purpose of the stop, reasonable suspicion to expand the scope of the stop had been established by that time.

After Defendant stopped for the night at a hotel in eastern Iowa, a free air dog sniff, together with all of the other circumstances, established probable cause to believe that drugs could be found in Defendant's vehicle. Accordingly, the automobile exception to the warrant requirement authorized law enforcement to conduct a warrantless search. Defendant had no reasonable expectation of privacy in the parking lot of the hotel and, therefore, cannot object to the dog sniff on that basis.

The fact that the officers first obtained a search warrant – which is apparently invalid – does not prevent the Government from relying on the alternative grounds to search provided by the automobile exception. Even *if* a *Franks* violation occurred in obtaining the warrant, the exclusionary rule will not be applied when the evidence was lawfully obtained by other means.

Finally, Defendant was not "seized" when he voluntarily accompanied officers to the parking lot, and was not subjected to a custodial interrogation while waiting in the parking lot for the search warrant to be issued. I find no Constitutional violations here.

## VI. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the Motion to Suppress (docket number 21) filed by Defendant on June 29, 2012 be **DENIED**.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on July 13, August 6, and August 16, 2012.*

DATED this _30th_ day of August, 2012.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA