IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | No. 12-CR-40-LRR |
| vs. | | **ORDER** |
| DAVID WAYNE HOLLEMAN, | | |
| Defendant. | | |

_____

*TABLE OF CONTENTS*

I.    *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   *RELEVANT PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  *STANDARD OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.   *RELEVANT FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . 3

V.    *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      A.   *Western Iowa Stop* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
           1.   *Basis for stop* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
           2.   *Scope and duration of stop* . . . . . . . . . . . . . . . . . . . . . . . 9
                a.   *Reasonable suspicion* . . . . . . . . . . . . . . . . . . . . . . 10
                b.   *But-for cause* . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      B.   *Search of Truck* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
           1.   *Reliance on automobile exception* . . . . . . . . . . . . . . . . . . 13
           2.   *Trespass* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
           3.   *Probable cause* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
           4.   **Miranda** *violation* . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VI.   *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*I. INTRODUCTION*

The matter before the court is Defendant David Wayne Holleman's Objections (docket no. 82) to United States Magistrate Judge Jon S. Scoles's Report and

Recommendation (docket no. 75), which recommends that the court deny Defendant's "Motion to Suppress" ("Motion") (docket no. 21).

## II. *RELEVANT PROCEDURAL HISTORY*

On May 22, 2012, a grand jury returned an Indictment (docket no. 2) against Defendant. The Indictment charges Defendant with knowingly and intentionally possessing with the intent to distribute 100 kilograms or more of a mixture or substance containing a detectable amount of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B).

On June 29, 2012, Defendant filed the Motion. On July 9, 2012, the government filed a Resistance (docket no. 29). On July 13, 2012, Judge Scoles held a hearing on the Motion. *See* Minute Entry (docket no. 35). Defendant appeared in court with his attorney, Dean A. Stowers. Assistant United States Attorney Dan Chatham represented the government. Judge Scoles received evidence and continued the hearing to August 6, 2012. On July 31, 2012, the government filed a Supplemental Brief (docket no. 50). On that same date, Defendant filed a Reply (docket no. 52) to the government's Resistance. On August 6, 2012, the hearing resumed. *See* Minute Entry (docket no. 55). Judge Scoles received evidence and continued the hearing, which was concluded on August 16, 2012. *See* Minute Entry (docket no. 62). On August 20, 2012, the government filed a Second Supplemental Brief (docket no. 70). On August 30, 2012, Defendant filed a Reply (docket no. 74) to the government's Second Supplemental Brief. On that same date, Judge Scoles issued the Report and Recommendation, which recommends that the court deny the Motion. On September 13, 2012, Defendant filed his Objections. On September 20, 2012, the government filed a Response (docket no. 89) to Defendant's Objections. On October 12, 2012, Defendant filed a Reply (docket no. 100) to the government's Response.

In his Objections, Defendant requests that the court hold a hearing on the matter "because the record is complex and extended and the [c]ourt would benefit from the knowledge of both counsel of record in reviewing the Report and Recommendation."

Objections at 2 (footnote omitted). The court finds that a hearing is unnecessary. The matter is fully submitted and ready for decision.

## III. STANDARD OF REVIEW

When a party files a timely objection to a magistrate judge's report and recommendation, a "judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b)(3) ("The district judge must consider de novo any objection to the magistrate judge's recommendation."); *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) (noting that a district judge must "under[take] a de novo review of the disputed portions of a magistrate judge's report and recommendations"). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b)(3) ("The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions."). It is reversible error for a district court to fail to engage in a de novo review of a magistrate judge's report when such review is required. *Lothridge*, 324 F.3d at 600. Accordingly, the court reviews the disputed portions of the Report and Recommendation de novo.

## IV. RELEVANT FACTUAL BACKGROUND[1]

On May 8, 2012, Iowa State Patrol Officer Jerod Clyde was driving westbound on Interstate 80 after finishing a training session in Des Moines, Iowa. Trooper Clyde saw a white Chevy truck headed eastbound. According to Trooper Clyde, the white Chevy truck was traveling at 73 miles per hour in a 70 mile per hour zone. Trooper Clyde continued

---

[1] After reviewing the hearing transcript, the court finds that Judge Scoles accurately and thoroughly set forth the relevant facts in the Report and Recommendation. *See* Report and Recommendation at 3-10. Accordingly, the court only briefly summarizes the facts. When relevant, the court relies on and discusses additional facts in conjunction with its analysis of the law.

westbound until he found a place to turn around. By the time he caught up with the white Chevy truck, there was a semi-truck ahead of it. According to Trooper Clyde, the semi-truck was traveling at 70 miles per hour and the white Chevy truck was closing the gap between itself and the semi-truck. Trooper Clyde activated his lights and initiated a traffic stop.

After the white Chevy truck pulled over to the side of the road, Trooper Clyde approached the passenger side window. Trooper Clyde observed a single occupant in the truck, whom he later determined to be Defendant. Trooper Clyde asked Defendant to roll down the passenger side window. Defendant proceeded to roll down the window approximately one inch and, when Trooper Clyde asked him to roll it down farther, Defendant responded "no." Transcript Vol. II (docket no. 108) at 39. Trooper Clyde asked Defendant for his license, registration and insurance card, and Defendant complied by sliding the requested documents through the one-inch opening in the passenger side window. Trooper Clyde then asked Defendant to follow him back to the patrol car and Defendant complied. Once inside the patrol car, Trooper Clyde told Defendant that he was going to write him a warning ticket for speeding and following another vehicle too closely. Trooper Clyde proceeded to check Defendant's license, conduct a criminal history check and input information onto the warning memorandum. As Trooper Clyde conducted these tasks, he asked Defendant a number of questions, including where Defendant was headed, what kind of machinery was in the bed of his truck and how he was employed.

Approximately seven minutes into the stop, Trooper Clyde called the El Paso Intelligence Center ("EPIC") to conduct an additional check on Defendant. After EPIC returned no results, Trooper Clyde proceeded to ask Defendant additional questions, including whether Defendant had any guns, drugs or other contraband in his truck. Defendant responded no. Trooper Clyde then asked Defendant for permission to search Defendant's truck and deploy a drug dog. Defendant declined to give permission. At this point, Trooper Clyde decided to deploy his drug dog despite Defendant's response. While

Defendant waited in the patrol car, Trooper Clyde got his dog out of the patrol car and walked the dog around Defendant's truck. The dog, however, did not successfully sniff the truck because it was distracted by a "fur ball type thing of some animal that was hit," *id.* at 64. Trooper Clyde returned the dog to the patrol car and told Defendant that he was free to leave.

After Defendant left, Trooper Clyde "felt like [the] stop didn't go the way a normal traffic stop should go" and "was adamant that something was still not right and . . . wanted to pass that information on to another . . . K9-unit or another department." *Id.* at 69-70. Ultimately, Trooper Clyde contacted Drug Enforcement Administration ("DEA") Task Force Officer Nick Nolte and told him about the traffic stop, described Defendant's truck and relayed that Defendant was headed toward Cedar Rapids, Iowa.

Agent Nolte consulted with his supervisor and decided to further investigate. He positioned himself at a rest stop off of Interstate 80 near Grinnell and watched for Defendant's truck. At approximately 7:00 p.m. on May 8, 2012, Agent Nolte saw a truck matching Trooper Clyde's description pass the rest stop. Agent Nolte followed the truck and confirmed that it was Defendant's truck. Eventually, Defendant exited the interstate and drove to a hotel in Williamsburg, Iowa. Agent Nolte followed Defendant and called local law enforcement to ask whether there was a K9-unit in the area. Shortly thereafter, Defendant left the hotel and went to a nearby restaurant. After Defendant returned and went back inside the hotel, Agent Nolte called Deputy Mark Tiedt, the K9 deputy in the area.

Deputy Tiedt arrived and, at approximately 9:00 p.m., he deployed his dog, Henri, to sniff Defendant's truck in the parking lot of the hotel. According to Deputy Tiedt, he deployed Henri by "start[ing] the free air sniff on the vehicles on the northeast corner of the parking lot." Transcript Vol. I (docket no. 44) at 88. Deputy Tiedt directed Henri to sniff a total of four vehicles before reaching Defendant's truck. Henri did not alert, indicate or otherwise change his behavior when sniffing the first four vehicles. Deputy

Tiedt then directed Henri to sniff Defendant's truck.  When Henri reached the passenger side of the truck, Henri "stop[ped] dead in his tracks and be[gan] to really detail the area between the bed of the truck and the cab of the truck." *Id.* at 89.  Deputy Tiedt characterized Henri's reaction as an "alert." *Id.* at 90.  Deputy Tiedt then pulled Henri away from the truck and directed Henri to sniff the vehicle next to the truck.  Henri did so and did not alert, indicate or otherwise change his behavior.  Deputy Tiedt then took Henri back to Defendant's truck and directed him to sniff the truck again.  On this second sniff, Henri "stopped and detailed the same area as the first time." *Id.* at 92.

Based on Henri's reaction to Defendant's truck, law enforcement obtained a search warrant and ultimately located approximately 250 pounds of marijuana inside the arc welders that were in the back of Defendant's truck.

## *V.  ANALYSIS*

"Defendant objects to the facts found and legal analysis employed by the Magistrate Judge in virtually every major point of the forty three pages of the [Report and Recommendation]."  Objections at 2 (footnote omitted).  The court first addresses Defendant's arguments relating to the traffic stop in western Iowa.  The court then turns to consider Defendant's arguments relating to the search of his truck in Williamsburg, Iowa.

### *A.  Western Iowa Stop*

Defendant first contends that Trooper Clyde did not have probable cause to believe that Defendant was speeding or following the semi-truck in front of him too closely. Defendant further contends that, even if there was a valid basis for the traffic stop, Trooper Clyde unreasonably extended the stop.

#### *1.     Basis for stop*

First, Defendant argues that Trooper Clyde violated his Fourth Amendment rights because there was no lawful basis for the traffic stop.  Defendant argues at great length that the court should discount Trooper Clyde's testimony that Defendant was speeding because Trooper Clyde's account of where he first spotted Defendant's truck is both incredible and

inconsistent. Rather, Defendant argues that the court should accept his testimony that he was using his cruise control and that he was traveling at 68 miles per hour. Furthermore, Defendant argues that he was not following the semi-truck too closely, as evidenced by the video of the stop. Defendant specifically objects to Judge Scoles's application of a "two-second rule" for assessing whether Defendant was following the semi-truck too closely. Defendant contends that, because there was no valid basis for the stop, the court must suppress all evidence obtained as a result of the stop.

After reviewing the hearing transcript, the exhibits admitted at the hearing and the parties' briefs, the court agrees with Judge Scoles that the stop was permissible under the Fourth Amendment. "A traffic violation, no matter how minor, provides an officer with probable cause to stop the driver." *United States v. Coleman*, ___ F.3d ___, ___, No. 12-1400, 2012 WL 5439287, at *2 (8th Cir. Nov. 8, 2012). "An officer is justified in stopping a motorist when the officer objectively has a reasonable basis for believing that the driver has breached a traffic law." *Id.* (quoting *United States v. Mallari*, 334 F.3d 765, 766-67 (8th Cir. 2003)) (internal quotation marks omitted); *see also United States v. Andrews*, 454 F.3d 919, 921 (8th Cir. 2006) ("Probable cause exists when a reasonable officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair probability that a violation of law had occurred."). In this case, although Trooper Clyde gave inconsistent accounts of where he first spotted Defendant's truck, the court finds Trooper Clyde's testimony that Defendant was speeding credible. Notably, when Trooper Clyde first informed Defendant that he pulled him over for going 73 miles per hour in a 70 mile per hour zone, Defendant did not disagree. *See* Government Exhibit 1 at 16:17:20. In fact, Defendant only mentioned that he had his cruise control set at 68 miles per hour in response to Trooper Clyde's inquiry as to whether Defendant was using his cruise control. *Id.* at 16:17:54. Even then, Defendant did not disagree that he was going 73 miles per hour but, rather, merely stated that he should lower his cruise control by about 5 miles per hour. *Id.* In light of all the evidence presented at

the hearing, the court agrees with Judge Scoles that Trooper Clyde had probable cause to believe that Defendant was speeding.

Moreover, the court agrees with Judge Scoles that Trooper Clyde could reasonably believe that Defendant was following the semi-truck too closely in violation of Iowa Code section 321.307. The video of the stop shows Defendant's truck as it approaches the semi-truck. Although, as Defendant points out, there was no inclement weather and it was daytime, the court agrees with Judge Scoles's analysis that a "two-second rule" is a reasonable method for determining a safe distance between automobiles traveling at interstate speeds. *See* Report and Recommendation at 13-14 (discussing *United States v. Lopez*, 564 F.3d 1001, 1003 (8th Cir. 2009) (applying a two-second rule when analyzing a Nebraska statute)); *see also Andrews*, 454 F.3d at 921-22 (noting that, although "the so-called 'two-second rule' is not enshrined in Nebraska law, it is a widely-used rule of thumb" and stating that, "when one car trails another by less than two seconds, an officer will generally have probable cause to believe that the trailing car is closer than what is reasonable and prudent"). Based on the video, the court agrees with Judge Scoles that Trooper Clyde could reasonably believe that Defendant was not leaving at least two seconds between his truck and the semi-truck in front of him.[2] Although Defendant objects to Judge Scoles's reliance on an Eighth Circuit Court of Appeals case discussing the Nebraska statute prohibiting vehicles from following too closely, the court believes that the two-second rule, while not "enshrined in [Iowa] law," *Andrews*, 454 F.3d at 921, is an "objectively . . .

---

[2] In the video, Trooper Clyde suggests to Defendant that he leave "three white lines" between his truck and the vehicle in front of him. Government Exhibit 1 at 16:17:31. In the Report and Recommendation, Judge Scoles found that "the 'rule of thumb' being applied by [Trooper] Clyde was more favorable to the driver than the rule found to be an 'appropriate measurement' by the Eighth Circuit in *Lopez*." Report and Recommendation at 14. In other words, whether the court applies Trooper Clyde's three-white-line rule or the two-second rule, Trooper Clyde had probable cause to believe that Defendant was following the semi-truck too closely.

reasonable basis," *Coleman*, 2012 WL 5439287, at *2, for believing that a vehicle is following too closely.[3]

Because the court concludes that Trooper Clyde had probable cause to believe that Defendant committed at least one traffic violation, the court finds that the initial stop did not violate the Fourth Amendment.

### 2. *Scope and duration of stop*

Next, Defendant argues that, even if Trooper Clyde had a valid basis for the initial stop, Trooper Clyde exceeded the permissible scope and duration of the stop. Defendant agrees with Judge Scoles that Trooper Clyde completed the standard investigation relating to the traffic violations approximately seven minutes into the stop. Defendant argues that Trooper Clyde did not have a reasonable suspicion that Defendant was engaged in criminal activity unrelated to the traffic stop. Thus, Defendant argues that Trooper Clyde unlawfully extended the stop when he called EPIC, conducted additional questioning and deployed his drug dog.

The court first addresses Defendant's contention that Trooper Clyde did not have a reasonable suspicion that Defendant was engaged in criminal activity unrelated to the traffic stop. Although the court finds that Judge Scoles correctly concluded that Trooper Clyde did have a reasonable suspicion, the court then turns to consider whether, alternatively, the extended stop was a but-for cause of law enforcement's later discovery of the marijuana in Defendant's truck.

---

[3] The court also takes judicial notice of the Iowa Driver's Manual, which encourages drivers to use the two-second rule. *See* Iowa Dep't of Transp., Iowa Driver's Manual 38 (2011-2012), *available at* www.iowadot.gov/mvd/ods/dlmanual.htm; *see also* Fed. R. Evid. 201(b) ("[T]he court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

### a.    *Reasonable suspicion*

When an officer conducts a traffic stop, the officer may lawfully "detain the driver while he completes a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning." *United States v. Munoz*, 590 F.3d 916, 920-21 (8th Cir. 2010) (quoting *United States v. Barragan*, 379 F.3d 524, 528-29 (8th Cir. 2004)) (internal quotation marks omitted).

> Once this initial investigation is finished, however, the purpose of the traffic stop is complete and further detention of the driver or vehicle would be unreasonable, unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention or unless the continued encounter is consensual.

*Id.* (quoting *United States v. Flores*, 474 F.3d 1100, 1103 (8th Cir. 2007)) (internal quotation marks omitted); *see also United States v. Garcia*, 613 F.3d 749, 752 (8th Cir. 2010) ("'A seizure that is justified solely by the interest in issuing a warning ticket can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.'" (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005))). However, "[a]n officer may expand the scope of a traffic stop beyond the initial reason for the stop and prolong the detention if the driver's responses and the circumstances give rise to a reasonable suspicion that criminal activity unrelated to the stop is afoot." *United States v. Chavez Loya*, 528 F.3d 546, 553 (8th Cir. 2008). "[R]easonable suspicion may exist even if 'each factor giving rise to suspicion might appear to be innocent when viewed alone . . . .'" *Id.* (quoting *United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002)).

In this case, the court agrees with Judge Scoles that Trooper Clyde had a reasonable suspicion that Defendant was engaged in criminal activity unrelated to the traffic stop that warranted a further investigation. As an experienced Iowa State Patrol officer, Trooper Clyde could reasonably believe that "criminal activity unrelated to the stop [was] afoot," *id.*, given that: (1) Defendant failed to open the passenger side window more than one inch

when Trooper Clyde first approached Defendant's truck; (2) Defendant provided a hesitant answer regarding where he was going; (3) Defendant had a Washington state license plate and stated that he was driving the arc welders in his truck to Washington D.C. but curiously stated that he was dropping off only one of the two arc welders in D.C. and that the other arc welder belonged to him; (4) Defendant's stated occupation—video producer—was inconsistent with the arc welders; and (5) Trooper Clyde believed that Defendant was displaying nervous energy and was breathing heavily. In his Objections, Defendant offers up innocent explanations for each of these factors. For example, Defendant suggests that he did not open his window more than an inch because he did not want to lean across the passenger seat to roll the window down any farther. However, while there may be an innocent explanation for each factor when viewed in isolation, together the factors reasonably suggested that "criminal activity unrelated to the stop [was] afoot." *Id.* Thus, for the reasons more fully stated in the Report and Recommendation, the court finds that Trooper Clyde did not violate Defendant's Fourth Amendment rights by extending the stop.

### b.    But-for cause

Even if Trooper Clyde did not have a reasonable suspicion that Defendant was engaged in criminal activity, Defendant does not seek to exclude any evidence obtained during the extended stop. Defendant contends that Trooper Clyde would not have called Agent Nolte had Trooper Clyde not extended the stop, and, thus, Agent Nolte would not have proceeded with the investigation that ultimately led to law enforcement uncovering 250 pounds of marijuana in Defendant's truck. *See* Objections at 16. Accordingly, Defendant maintains that the marijuana law enforcement found during the search of his truck in eastern Iowa should be excluded as fruit of the poisonous tree.

The exclusionary rule applies only when law enforcement would not have obtained the evidence but for a constitutional violation. *See United States v. Peralez*, 526 F.3d 1115, 1121 (8th Cir. 2008) ("Only if the constitutional violation was 'at least a but-for cause of obtaining the evidence' is suppression of evidence the appropriate remedy."

(quoting *United States v. Olivera-Mendez*, 484 F.3d 505, 510 (8th Cir. 2007))); *United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007) ("There is no reason to exclude evidence . . . if the police misconduct is not even a 'but-for' cause of [the] discovery of the evidence." (alteration in original) (quoting *Hamilton v. Nix*, 809 F.2d 463, 465 (8th Cir. 1987)) (internal quotation marks omitted)). For example, in *Peralez*, an officer prolonged a traffic stop by asking the driver of the vehicle and the defendant, who was a passenger, a number of drug interdiction questions. 526 F.3d at 1117-18, 1120. The officer then deployed his drug dog, which alerted to the presence of drugs. *Id.* at 1118. The officer proceeded to search the vehicle and discovered contraband. *Id.* Although the Eighth Circuit found that the officer prolonged the stop in violation of the Fourth Amendment, it concluded that suppression was not an appropriate remedy under the circumstances. *Id.* at 1121. The Eighth Circuit found that the unlawfully prolonged stop was not the but-for cause of the officer's discovery of contraband because it was apparent that the officer intended to deploy the dog before he prolonged the stop with drug interdiction questions and, furthermore, "nothing in the record indicate[d] that the answers to the questions posed during the unlawful expansion of the traffic stop caused [the officer] to utilize [the drug dog]." *Id.*

In this case, Trooper Clyde's suspicions were aroused during the approximately seven minutes it took to complete the routine tasks related to the traffic stop. As a result, Trooper Clyde detained Defendant for an additional fifteen minutes, during which time he called EPIC, asked Defendant additional questions and unsuccessfully deployed his drug dog. Defendant points to nothing that happened during those fifteen minutes that would have caused Trooper Clyde's suspicions to grow. *See Marasco*, 487 F.3d at 547 ("When the issue is whether challenged evidence is the fruit of a Fourth Amendment violation, the defendant bears the initial burden of establishing the factual nexus between the constitutional violation and the challenged evidence."). EPIC returned no results, Defendant did not make any admissions regarding contraband in his truck and Trooper

Clyde's drug dog did not successfully sniff the truck. Thus, the court finds that Trooper Clyde would have called Agent Nolte even if he had not extended the stop. Consequently, even if Trooper Clyde violated Defendant's Fourth Amendment rights by extending the stop, the constitutional violation was not a but-for cause of law enforcement's later discovery of the marijuana in Defendant's truck and, therefore, suppression of the marijuana is not warranted.

### B. Search of Truck

Defendant raises a number of issues relating to the search of his truck in Williamsburg, Iowa. First, Defendant contends that the government may not rely on the automobile exception to the warrant requirement because the purposes of the exclusionary rule would be undermined if the court merely ignores the alleged search warrant defects and *Franks*[4] violation. Second, Defendant maintains that he had a subjective and reasonable expectation of privacy in the hotel parking lot and, thus, law enforcement violated his Fourth Amendment rights by entering the parking lot to deploy Henri, the drug dog. Third, Defendant argues that, even if the government could rely on the automobile exception and officers were lawfully in the hotel parking lot, the search of his truck was unconstitutional because the officers did not have probable cause to believe that there was contraband in his truck. Finally, Defendant argues that law enforcement violated his *Miranda*[5] rights by interrogating him while he was in the hotel parking lot waiting for officers to obtain the search warrant.

### 1. Reliance on automobile exception

First, Defendant argues that the government may not rely on the automobile exception to the warrant requirement because law enforcement sought and obtained a warrant before searching Defendant's truck. Defendant argues that, due to the many

---

[4] *Franks v. Delaware*, 438 U.S. 154 (1978).

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

alleged search warrant defects and the alleged *Franks* violation, this case "cries out for the application of the exclusionary rule." Objections at 22. Defendant further argues that law enforcement would not have searched his truck but for the warrant and, thus, failure to "suppress the evidence in this case gives the police a windfall benefit." *Id.*

For the reasons set forth in the Report and Recommendation, the court finds that Defendant's arguments are without merit. Specifically, in *United States v. Martinez*, 78 F.3d 399, 401 (8th Cir. 1996), the Eighth Circuit made "it clear that if law enforcement obtains a search warrant which is subsequently determined to be invalid, the search may be authorized nonetheless under the automobile exception." Report and Recommendation at 36; *see also United States v. McCoy*, 977 F.2d 706, 710 (1st Cir. 1992) ("Assuming, without deciding, the search warrant was invalid, we nonetheless conclude that the district court properly denied the motions to suppress, as the search was permissible under the 'automobile exception' to the Fourth Amendment warrant requirement."); *United States v. Martin*, 690 F.2d 416, 419 (4th Cir. 1982) (finding it unnecessary to decide whether the search warrant was valid because the search was authorized under the automobile exception). Although Defendant contends that policy considerations make *Martinez* inapplicable when there is a *Franks* violation, the court finds no support for such an argument. Accordingly, the court finds it unnecessary to address Defendant's arguments regarding the validity of the search warrant. Rather, the court shall consider whether the search was authorized under the automobile exception to the warrant requirement.[6]

---

[6] Defendant also raises a number of other arguments related to the government's reliance on the automobile exception. *See* Objections at 22-23. The court finds that Defendant's arguments are without merit. Notably, Defendant suggests that law enforcement "did not have the right to drive [Defendant's] vehicle to another location to search it" pursuant to the automobile exception. *Id.* at 22. Defendant cites no authority to support such an argument, and the court finds that it was reasonable for the officers to move Defendant's truck to the fire station to conduct the search, particularly in view of the fact that the search occurred at night. *Cf. Chambers v. Maroney*, 399 U.S. 42, 52 n.10 (1970) ("It was not unreasonable in this case to take the car to the station house. All

(continued…)

14

### 2.    *Trespass*

Next, Defendant argues that law enforcement conducted a warrantless search in violation of the Fourth Amendment by deploying Henri, the drug dog, in the hotel parking lot. Defendant claims that he had an expectation of privacy in the hotel parking lot, as evidenced by the "Private Drive" sign posted by the road leading to the parking lot.

For the reasons stated in the Report and Recommendation, the court finds that law enforcement did not violate the Fourth Amendment by entering the parking lot to deploy Henri. The court agrees with Judge Scoles that, even if Defendant had a subjective expectation of privacy in the hotel parking lot, that expectation was not objectively reasonable. *See United States v. Reed*, 733 F.2d 492, 501 (8th Cir. 1984) (concluding that the defendant did not have a reasonable expectation of privacy in a "fenced but open back parking lot" of a business); *see also United States v. Washburn*, 383 F.3d 638, 642 (7th Cir. 2004) ("We have always rejected the notion that a hotel occupant enjoys the same expectation of privacy in his car in the parking lot of the hotel as he does in the room itself; the hotel parking lot is 'readily accessible to the public and not generally thought of as a place normally used as a residence.'" (quoting *United States v. Foxworth*, 8 F.3d 540, 545 (7th Cir. 1993))); *United States v. Diaz*, 25 F.3d 392, 396 (6th Cir. 1994) ("Although [the defendant] may have had an expectation of privacy in his motel room and (albeit less so) in his car, that expectation did not extend to the lot, which the officers could lawfully enter."); *cf. United States v. Scott*, 610 F.3d 1009, 1016 (8th Cir. 2010) ("Supreme Court and Eighth Circuit precedent support the conclusion that [the drug dog's] sniff of the apartment door frame from a common hallway did not constitute a search subject to the

---

[6](...continued)
occupants in the car were arrested in a dark parking lot in the middle of the night. A careful search at that point was impractical and perhaps not safe for the officers . . . ."); *see also United States v. Estrada*, 459 F.3d 627, 634 n.7 (5th Cir. 2006) ("The officers do not need to obtain a warrant to move the vehicle from the roadside to a garage if there is probable cause to search a vehicle.").

Fourth Amendment."). Accordingly, the court finds that law enforcement's deployment of Henri to sniff Defendant's truck in the hotel parking lot did not constitute a "search" within the meaning of the Fourth Amendment and, thus, no warrant was necessary to conduct the sniff.

### 3.    *Probable cause*

Next, Defendant contends that, even if the government may rely on the automobile exception and law enforcement officers were lawfully in the hotel parking lot, Henri's "alert" did not establish probable cause to believe that there was contraband in Defendant's truck. Before turning to Defendant's specific arguments, the court finds it necessary to provide a brief background on Henri's training and explain the relevant terminology. In September 2009, Deputy Tiedt and Henri attended Northern Michigan K-9 School. Transcript Vol. I at 69-70. They completed the program and obtained their certification in October 2009. *Id.*; *see also* Government Exhibit 2 (docket no. 63) at 4. They have been recertified annually. Transcript Vol. I at 70; *see also* Government Exhibit 2 at 1-3. Henri is trained to detect four types of drugs: marijuana, methamphetamine, cocaine and heroin, as well as any derivatives of those controlled substances. Transcript Vol. I. at 33. In addition to detecting drugs, Henri is trained to detect "[h]uman odor." *Id.* When Deputy Tiedt deploys Henri to sniff for drugs, he gives a specific oral command that is different than the command he gives when he deploys Henri to sniff for human odor. *Id.* at 74. During the hearing, Deputy Tiedt distinguished between two different types of responses—an "alert" and an "indication." *Id.* at 78-79. Deputy Tiedt characterized an "alert" as "a real intense deep sniff." *Id.* at 78. An "indication" is Henri's trained response, which is to sit down. *Id.* at 78-79. Deputy Tiedt testified that Henri indicates when he has found the strongest source of the odor and that an alert generally precedes an indication. *Id.* at 78. Deputy Tiedt testified that "an alert is as important as an indication" and that, in his experience, an alert meant Henri had detected the odor of narcotics. *Id.* at 90.

In this case, it is undisputed that Henri did not engage in his trained response—in other words, he did not indicate, but, rather, he alerted. Defendant argues that an alert is insufficient to establish probable cause. Specifically, Defendant contends that an Eighth Circuit case, *United States v. Jacobs*, 986 F.2d 1231 (8th Cir. 1993), is directly on point and holds that a dog's mere change in behavior does not establish probable cause. Defendant further argues that an alert is insufficient because it is subtle and, oftentimes, the dog handler may be the only person able to discern an alert. Moreover, Defendant contends that "[a dog] handler is not in the position of translating subjective dog behaviors that are short of the trained objectively observable response known as an indication." Objections at 17. Defendant also contends that Henri is not reliable, as evidenced by his poor field performance. Finally, Defendant objects to Judge Scoles's suggestion that there are other circumstances relevant to the probable cause inquiry.[7]

After reviewing the hearing transcript, the exhibits admitted at the hearing and the parties' briefs, the court finds that Judge Scoles correctly concluded that law enforcement had probable cause to believe that there was contraband in Defendant's truck, although the court acknowledges that this case presents a close question. The court agrees with Judge Scoles that the facts of this case are distinguishable from *Jacobs*. In *Jacobs*, law enforcement received a tip that a package addressed to the defendant appeared to be suspicious. 986 F.2d at 1232-33. Officers went to the Federal Express office and deployed a drug dog to sniff "six to eight packages, including the package addressed to the

---

[7] In his Reply to the government's Response to the Objections, Defendant argues that Henri's sniff constitutes a "search" within the meaning of the Fourth Amendment because, in addition to drugs, Henri is trained to detect human odor. *See* Reply to Government's Response to Objections at 4. The court finds that such an argument is without merit. Deputy Tiedt testified that, when he deploys Henri to sniff for drugs, he gives a specific oral command that is different than the command he gives when he deploys Henri to sniff for human odor. Transcript Vol. I at 74. The court concludes that, although Henri may be capable of detecting odors other than those associated with narcotics, Deputy Tiedt's specific command sufficiently guaranteed that Henri sniffed only for the odor of narcotics.

defendant." *Id.* at 1233. The dog "showed an interest in the defendant's package by pushing it around with his nose and scratching it twice." *Id.* However, the dog's response was not its trained response, and the dog handler "was not sure that the package contained drugs." *Id.* Thereafter, law enforcement sought a search warrant to open the package but failed to inform the magistrate judge that the drug dog's reaction was not its trained response. *Id.* The defendant alleged a *Franks* violation and the Eighth Circuit held:

> the failure to inform the magistrate judge that the dog had not given its trained response when confronted with a package containing drugs, coupled with the dog handler's admission that he could not say with certainty that drugs were in the package, causes us to hold that the warrant would not have been supported by probable cause, if the omitted material had been included.

*Id.* at 1235.

In this case, Deputy Tiedt testified that, in his experience, Henri's alert meant that Henri had detected the odor of drugs but was unable to identify the strongest source. Thus, unlike in *Jacobs*, Henri did not give an ambiguous response that Deputy Tiedt was unable to interpret. *See United States v. Christian*, 452 F. App'x 283, 286 (4th Cir. 2011) ("[T]he credibility of a dog's alert rests 'almost entirely on the credibility of the dog handler's testimony [b]ecause the handler is the only witness who can speak to the subjective interaction during a particular dog alert.'" (alteration in original) (quoting *United States v. Howard*, 621 F.3d 433, 449 (6th Cir. 2010))). Thus, the court finds that *Jacobs* is distinguishable from the instant action.

Because *Jacobs* is not directly on point, the court turns to consider whether Henri's alert, in combination with the suspicious behavior Trooper Clyde observed during the stop in western Iowa,[8] established probable cause to believe that there was contraband in

---

[8] In his Reply to the government's Response to the Objections, Defendant contends that the court should not consider the western Iowa stop when determining whether law enforcement had probable cause to believe that there was contraband in Defendant's truck. *See* Reply to Government's Response to Objections at 7. Defendant offers no authority

(continued…)

18

Defendant's truck. Defendant argues at great length that a drug dog's alert, as opposed to the dog's trained response, is never sufficient to establish probable cause. The court finds that such a bright-line rule is inconsistent with the "fluid" and "nontechnical" nature of probable cause. *United States v. Ketzeback*, 358 F.3d 987, 991 (8th Cir. 2004) ("The existence of probable cause is . . . a fluid, nontechnical judgment made after a practical, commonsense evaluation of the totality of the circumstances." (quoting *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986)) (internal quotation marks omitted)); *see also United States v. Bach*, 400 F.3d 622, 628 (8th Cir. 2005) ("Probable cause is not a rigidly defined concept, for it depends on the totality of the circumstances and the specific facts in a given situation."). Under the facts of this case, the court finds that Henri's alert, when considered together with Trooper Clyde's observations during the western Iowa stop, established probable cause. Specifically, the court notes that Deputy Tiedt, Henri's handler, did not find Henri's response ambiguous. Rather, Deputy Tiedt believed that, in light of his history with Henri, Henri had detected narcotics but was unable to identify the strongest source of the odor. Furthermore, Henri alerted twice to Defendant's truck but did not have any reaction to the other vehicles he sniffed in the hotel parking lot. Thus, for the reasons more fully stated in the Report and Recommendation, the court finds that Henri's alert, in combination with the other circumstances in this case, provided law enforcement with probable cause to believe that there was contraband in Defendant's truck.

Finally, Henri's prior field performance does not undermine his credibility to such an extent as to alter the court's probable cause finding. Defendant suggests that Henri's performance records show that he has an "abysmal 59% rate of indicating to the presence of drugs when they are actually not found to be present." Objections at 19-20. However, in the Report and Recommendation, Judge Scoles found that, when considering both the

---

[8](…continued)
to support such an argument and, notably, it appears to undermine Defendant's previous argument that the western Iowa traffic stop is a but-for cause of the search in Williamsburg.

times Henri merely alerted as well as the times Henri alerted and indicated, Henri's success rate was approximately 57% and, moreover, Judge Scoles noted that there may have been possible explanations for those instances in which Henri indicated but law enforcement found no drugs. Report and Recommendation at 25-26. The court agrees with Judge Scoles's analysis of Henri's field performance. The court also notes the difficulty in determining a drug dog's success rate in the field. Specifically, a drug dog may detect residual odors or law enforcement may be unsuccessful in uncovering well-concealed drugs during a search. Thus, while the court gives some weight to Henri's field performance, "his record is only one of the factors [the court] consider[s] in the totality of the circumstances calculation." *United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir. 2007). Given Henri's training, his initial certification, his annual recertification and his approximately 57% accuracy rate, the court finds that Henri is sufficiently reliable. *See id.* (finding that a 54% accuracy rate is sufficient).

Thus, in light of the foregoing, the court agrees with Judge Scoles that law enforcement had probable cause to believe that there was contraband in Defendant's truck.[9]

### 4. Miranda *violation*

Finally, Defendant argues that the court should suppress his statement that he owned the arc welders in the truck, which he made in the parking lot of the hotel while he was waiting for officers to obtain a search warrant. First, the court finds that Defendant did not properly preserve this issue. In his Objections, Defendant notes that law enforcement "did not have the right to detain him in the parking lot," Objections at 22, while officers sought a search warrant; however, Defendant did not specifically object to Judge Scoles's conclusion that Defendant was not in custody for *Miranda* purposes. In his Reply to the government's Response to the Objections, however, Defendant contends that, under the

---

[9] The court notes that the Supreme Court of the United States granted certiori in two cases dealing with drug dogs: *Florida v. Harris*, No. 11-817 (cert. filed Dec. 21, 2011), and *Florida v. Jardines*, No. 11-564 (cert. filed Sept. 26, 2011). The Supreme Court heard argument in both cases on October 31, 2012.

factors outlined in *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990), he was in custody and, therefore, the court should suppress a statement that he "made outside his hotel related to ownership of the welders/generators." Reply to Government's Response to Objections at 11. The court finds that Defendant waived any argument related to the alleged *Miranda* violation because Defendant did not raise the issue in his Objections and the court need not consider arguments raised for the first time in a reply. *See United States v. Barraza*, 576 F.3d 798, 806 n.2 (8th Cir. 2009).

Even if Defendant did properly preserve this issue, the court finds that Judge Scoles correctly concluded that Defendant was not in custody at the time he made the statement at issue. *See* Report and Recommendation at 41-42. Thus, officers were not required to read Defendant his *Miranda* rights before questioning Defendant and, therefore, Defendant's response that he owned the arc welders is admissible. *See United States v. Sanchez*, 676 F.3d 627, 630 (8th Cir. 2012) (noting that *Miranda* warnings are required only when a suspect is subjected to custodial interrogation).

## VI. CONCLUSION

In light of the foregoing, **IT IS HEREBY ORDERED THAT**:

(1) The Objections (docket no. 82) are **OVERRULED**;

(2) The Report and Recommendation (docket no. 75) is **ADOPTED**; and

(3) The Motion (docket no. 21) is **DENIED**.

**DATED** this 12th day of December, 2012.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

21